HC&D MOVING & STORAGE COMPA-
NY, Inc., Hawaiian Packing & Crating
Co., Ltd., Bekins Van & Storage Co. of
Hawaii, Inc., Smyth Van & Storage Co.
of California, Inc., Sunvan & Storage
Company, Inc., Trans Ocean Van Serv-
ice of Hawaii, City Transfer Company,
Ltd., Hawaiian Van & Storage Compa-
ny, Ltd., and Trans-Pacific Van Com-
pany, Ltd., Plaintiffs,

v.

UNITED STATES of America and Inter-
state Commerce Commission, and Burn-
ham Van Service, Inc., Extension-Ha-
waii, et al., Defendants.

Civ. No. 2781.

United States District Court
D. Hawaii.

April 7, 1969.

Alan F. Wohlstetter, Denning &
Wohlstetter, Washington, D. C., A. Peter
Howell, Hogan, Howell & Rother,
Honolulu, Hawaii, for plaintiffs.

Edwin M. Zimmerman, Acting Asst.
Atty. Gen., John H. D. Wigger, Atty.,
Dept. of Justice, Washington, D. C.,
Yoshimi Hayashi, U. S. Atty., Honolulu,
Hawaii, for defendant the United States.

Robert W. Ginnane, Gen. Counsel,
Fritz R. Kahn, Deputy Gen. Counsel,
I.C.C., Washington, D. C., for defendant
Interstate Commerce Commission.

Before BARNES, Circuit Judge, and PENCE and TAVARES, District Judges.

PENCE, District Judge:

This is a review pursuant to 28 U.S.C. § 2325 of the Decision and Order of the Interstate Commerce Commission in Burnham Van Service, Inc., Extension-Hawaii, 103 M.C.C. 372 (1966) on the applications of 20 mainland-based motor common carriers of household goods authorized to operate between all or extensive areas in the continental United States under appropriate certificated authority, six Hawaii-based motor common carriers affiliated with mainland carriers, and two purely local Hawaii carriers,[1] for certification of public convenience and necessity authorizing interstate movement of household goods between points in Hawaii and points on the mainland.

By its decision the Commission approved the applications of 19 of the mainland carriers, and five of the Hawaii-based carriers, authorizing operations by them in interstate or foreign commerce, as common carriers by motor vehicle, over irregular routes, of household goods between points in Hawaii, restricted to the handling of traffic originating at or destined to out-of-state points. The application of a sixth Hawaii-based carrier was approved subject to restriction. The applications of the two local Hawaii carriers were refused, on the ground that they had not shown that there was a need for service that could not be provided by them pursuant to a pre-existing exemption under which they were already operating.[2]

The plaintiffs, all Hawaii-based carriers, have appealed the order of the Commission insofar as it granted the applications of the 19 mainland-based applicants and, having exhausted their administrative remedies, properly appear in this court pursuant to the provisions of 28 U.S.C. § 1336. It is the contention of plaintiffs that the Commission's decision on the applications of the 19 mainland-based carriers is unwarranted by the facts, is an abuse of discretion and constitutes an arbitrary departure from principles of law well-established by the Commission and the courts.

■■ This court is cognizant of the permitted scope of judicial review of administrative actions, recognizing that its duties are "limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene."[3] It is also not unaware of the obligation of the Commission to set forth facts from which the Commission's findings and conclusions can be said rationally to follow and its correlative obligation to apply the relevant law thereto.

Commissioner Murphy, Chairman of Division I of the Interstate Commerce Commission acted as Hearing Examiner, and Division I of the Commission, with Commissioner Murphy sitting thereon, did but affirm and adopt, in toto, the statement of facts, conclusions and findings of "Hearing Examiner" Murphy as the sole basis for its Decision and Order.

A review of the Examiner's report discloses that the plaintiffs herein are all local Hawaii-based motor carriers engaged primarily in the transportation of household goods between points in Hawaii, each with its own investment in facilities and equipment in Hawaii and with its own employees operating that equipment. With but immaterial exceptions, not one of the defendant mainland-based applicants had conducted any past

---

1. See Appendix A of *Burnham, supra*, at 394–397 for complete list of parties.

2. See Motor Carrier Operation in the State of Hawaii, 84 M.C.C. 5 (1960).

3. United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535–536, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

physical motor carrier operations within the State of Hawaii of the nature carried on by the local Hawaii carriers,[4] nor did any dominate, direct or control the operations of the local Hawaiian carriers so that it could be said the operations of the Hawaii-based carriers were their own operations.[5] The local Hawaii carriers were, but with two exceptions,[6] nonexclusive agents for two or more of the mainland carriers.

The applicants had transported varying volumes of traffic which had moved between numerous points throughout the continental United States on the one hand and points in Hawaii on the other, comprised of both government shipments handled for the Department of Defense and individual and so-called "national account" customers which are solicited directly and through conventional advertising media in Hawaii and the mainland states.

Commissioner Murphy "found":

"The highway portion of the movements on the Island of Oahu are handled by most of the mainland applicants on an agency basis through locally domiciled carriers and by the remainder of these applicants (Cartwright and Dean) through either subsidiary corporations or branch offices physically based in this area. The highway segment of shipments moving from or to points on the other major islands (Hawaii, Maui, and Kauai) are handled by the mainland applicants through nonexclusive subagency arrangements effected generally by their agents with local operators on such islands."[7]

And the Commissioner continued:

"These operating methods are consistent with those employed by these applicants on the mainland where each functions through a widespread network of agency representatives [etc.] * * *. The type of control relationship and pooling plan or other arrangements under which each of the mainland applicants and their respective carrier-agents including those in Hawaii operate are similar to the agency contract agreement * * * approved by the Commission in North American Van Lines, Inc.-Investigation of Control, 60 M.C.C. 701.

" * * * [A]ll of the shipments involved here move under a through bill of lading in the name of the mainland carrier or the government (in which case the bill identifies the mainland carrier selected as the through carrier and as the shipper for the waterborne movement) * * * [T]he mainland carrier assumes full responsibility for all * * * damage claims on all segments of the move

---

4. Two of the "mainland" applicants formerly maintained their own offices and other facilities in Hawaii at Honolulu through which the involved operations were conducted. (Lyon, from 1955–1956, and Global, from March 1957–May 1961). However, these carriers terminated such arrangements in favor of operating instead through agencies.

5. Hawaii-based carriers with any ties to the mainland applicants are as follows:
   (1) *Bekins*, a California corporation based in Hawaii, is a subsidiary of Bekins Van Lines Co. of California;
   (2) *Dean of Hawaii*, a California corporation based in Hawaii, is an affiliate of Dean, a certified mainland carrier;
   (3) *Sunvan & Storage*, a Washington corporation based in Hawaii, is affiliated with a mainland exempt freight forwarder, Karevan, Inc.;
   (4) *Richmond*, a California corporation which performs its own operations in Hawaii and also operated in California;
   (5) *Smyth*, a Washington corporation based in Hawaii, is a division of Smyth of California, a wholly owned subsidiary of Smyth Worldwide Movers, Inc.;
   (6) *TOVS*, a Hawaiian-based affiliate of a California corporation which operates as an exempt freight forwarder;
   (7) *City Transfer* is exclusive agent for Aero Mayflower.

6. Richmond and City Transfer. See note 5, *supra*.

7. *Burnham, supra,* at 380–381.

*from* origin to destination to the same extent as on domestic traffic between points in the continental United States. Generally, the shipments are handled under a through rate named by the carrier, consisting of a combination of charges for the highway portions of the move both on the mainland and in Hawaii, pursuant to the carrier's conventional tariff filing, and for the ocean segment of the move, pursuant to * * * maritime tariffs * * *. The shipper ultimately pays the total transportation charges to the mainland carrier which, in turn, disburses appropriate payments to the various participants involved in the movement, consisting of the mainland and Hawaiian agents and the steamship company." [8]

Commissioner Murphy noted moreover:

"If the requested authorities are granted, most of the mainland applicants intend to continue operating in the same manner * * *, *viz.*, through agency arrangements in Hawaii." [9]

He noted also that some were willing, *"if necessary"* (emphasis added), to establish and operate their own facilities and equipment in Hawaii in providing the services involved.[10]

It is thus manifest from Commissioner Murphy's findings that the same method of operation theretofore utilized by Hawaii-based carriers vis-a-vis the mainland carriers was expected to continue after the Commission made its decision —no matter whether it granted or denied the applications of the mainland carriers.

The record clearly shows that the mainland carriers did but participate in interline operations with Hawaii-based carriers, with the Hawaii-based carriers supplying all of the physical properties and personnel necessary for the movement of goods on the Hawaii end of the operation. Thus there is nothing in the record to indicate that the Hawaii operations of the Hawaii-based carriers were inadequate or in any other way of such a nature as to justify the grants of authority, given by the Commission to mainland carriers, on the ground of public convenience or necessity.

Nothing appears in the Commission's "findings" to indicate that the "motor-van-seavan" and "through container" arrangements, routed in a combination land-sea-land movement, with shipments moving under the mainland carriers through bill of lading from origin to destination with undivided responsibility by a single carrier, were in any way substandard, even by any mainland practices, to the quality of service which the shippers in Hawaii or the mainland shippers utilizing the services had a right to expect. Likewise the findings do not indicate that the methodology uniformly followed in the handling of shipments to and from Hawaii need be changed in order to provide to the Hawaii and mainland shipping public the service theretofore enjoyed or expected in the predictable future. None of the findings in *Burnham* indicated any past, present or possible future deterioration in the interline method of handling household goods in and out of Hawaii of the nature found in Burnham Van Service, Inc., Household Goods—13 States, 98 M.C.C. 58 (1965), or T. E. K. Van Lines, Inc., Common Carrier Application, 86 M.C.C. 139 (1961). There is nothing in the findings to indicate that if the applications of the mainland carriers were denied that either the Hawaii or mainland shipping public would be given any different interline service than it had received prior to statehood, nor was there any finding that the mainland carriers would be adversely affected by the denial of the applications, inasmuch as, perforce, the mainland carriers would nevertheless still participate

8. *Id.* at 381–382.

9. *Id.* at 382.

10. *Ibid.*

in the revenues arising out of the Hawaii traffic in exactly the same manner as they had prior to statehood. There was no showing that if the requested authority were not granted to the mainland carriers the involved traffic would cease to be "solicited and contracted for in their own names both on the mainland and in Hawaii", or cease to move "under their billings and sole responsibility for all loss and damage claims."[11] There was neither a showing of any need for additional service in the Hawaii end of the traffic nor that additional physical services in Hawaii, made possible by the wholesale certification of mainland carriers, would improve the existing service![12] To the contrary, the Commission anticipated that the Hawaii based carriers would continue to handle the Hawaii land operations for the mainland applicants just as they had done theretofore.

Commissioner Murphy in his rhetorical question squarely recognized the key issue involved:

"Which group of applicants, the mainland carriers or the Hawaiian-based carriers, is entitled to receive grants of authority based upon past operations in which carriers of both groups jointly participated, in the light of the Commission's policy in 'grandfather' proceedings against issuing more than one right upon the basis of a single operation?"[13]

On that question, "Examiner" Murphy and the Commission decided that the Hawaiian situation was "unique" and therefore deviated from the "Commission's policy" and the applicable law:

"Under the unique circumstances herein, the 'grandfather' principles expounded in the *Mollerup* case, * * * relied upon by several Hawaiian-based

applicants are not controlling here * * *. Rather, the *significant factor* here is that all of these applicants or their predecessors have been and are actively engaged in the solicitation and transportation of Hawaiian traffic on a continuous basis. Accordingly, it is concluded that a grant of authority to *all* of the mainland applicants * * * is warranted." (Emphasis added.)[14]

Thus, on the tenuous "unique" "factor" that the mainland applicants had theretofore solicited Hawaii household goods business and had individually handled the mainland end of the Hawaii-mainland traffic, the Commission proceeded to disregard the rule it laid down in Mollerup Van Lines Alaska Grandfather Application, 95 M.C.C. 338 (1963), as well as Trans-American Van Services, Inc., Extension-Alaska, 94 M.C.C. 248 (1963); Von Der Ahe, Extension-Household Goods, 51 M.C.C. 253 (1950); and ignored United States v. Rosenblum Truck Lines, 315 U.S. 50, 62 S.Ct. 445, 86 L.Ed. 671 (1942); all of which uniformly hold that two carriers cannot each rely upon the same physical operations as a support for a grant of authority based solely upon past operations.[15] This concept of the applicable law not only preceded the "unique" Hawaiian situation, but also, as evidenced by the Commission's action in American Red Ball Transit Co., Extension-Hawaii, No. MC–6992 (Sub.-No. 10) (decided October 25, 1967), was reiterated, reaffirmed and reapplied by the Commission in *denying* to American Red Ball Transit the same authority it granted to the mainland carriers in the instant proceedings, even though that denial was based on exactly the same facts and in the same "unique" Hawaiian situation, the Commission then justifying its apparent "distinction without a difference" because of the "unique Hawaiian prob-

---

11. *Id.* at 389.

12. *Cf.* I.C.C. v. Parker, 326 U.S. 60, 70, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945).

13. *Burnham, supra,* at 387.

14. *Id.* at 389–390.

15. The Commission here apparently made the "wholesale distribution of permits" condemned in *Rosenblum, supra,* at 54, 62 S.Ct. 445.

lems and the equities that emerge when all [of the mainland and Hawaiian applications] were considered together [in the *Burnham* case]." *American Red Ball Transit, supra,* at 17. That the term "unique" in the context of the *Burnham* decision, lacked any substantial foundation or definitive meaning was pointed up by the Commission's action in *American Red Ball Transit.* The only uniqueness here involved was the unique abandonment of legal precedent by the Commission.

It appears to this court that the statements of Commissioner Murphy (though concerning a § 204(a) (4a) problem), in dissent in Ex Parte No. MC–59, Motor Carrier Operations in the State of Hawaii, 84 M.C.C. at 39 (1960), might well have been remembered:

> "I desire to record my fundamental disagreement with the apparent view of the majority that legislative intent and consistent administrative interpretation of a statute over a long period can be disregarded in order to reach a result that is considered otherwise desirable. I do not believe the purpose of the Congress and the precedents of this Commission should be treated so lightly * * *.
>
> "If the situation in Hawaii is in fact, so unique as to require the application of different principles than apply in other states and if the present law is to this extent outmode, I submit it is within the province of the Congress to legislate and not this Commission."

■■ Nevertheless, the finding that the Hawaii situation was "unique" at the time of the *Burnham* decision (but not subsequently in *American Red Ball Transit*) is the basis upon which this court is now asked to affirm the Commission's decision! While the courts cannot be concerned with the consistency or inconsistency of the conclusions and findings of the Commission,[16] "consistency of administrative *rulings* is essential, for to adopt different standards for similar situations is to act arbitrarily." (Emphasis added.) [17] The "law does not permit an agency to grant to one person the right to do that which it denies to another similarly situated. There may not be a rule for Monday, another for Tuesday, a rule for general application, but denied outright in a specific case." [18]

■ As indicated above, the evidentiary findings of the Commission in the light of the relevant law are not sufficient for this court to support the ultimate decision reached by that Commission that all 19 mainland applicants should receive grants of authority to operate as motor common carriers in Hawaii. The findings can but lead this court to conclude that there is such a violent conflict between the Commission's application of the law to the facts here in *Burnham* and the same Commission's own rulings on *Mollerup* and *American Red Ball Transit* that unless this court would make itself but a rubber stamp, we cannot approve the Commission's present action.

This court, however, does not propose to substitute its judgment for the factual expertise of the Commission. It may be that the facts of the Hawaii situation, if more fully developed than appear in the record and Decision, might erase the apparent conflict above noted, and the court feels that the Commission should be given the opportunity, if it so desires, to reevaluate the Hawaiian operations, circumscribed only by this court's rulings

---

16. Virginian Ry. Co. v. United States, 272 U.S. 658, 665–666, 47 S.Ct. 222, 71 L.Ed. 463 (1926); Western Paper Makers' Chemical Co. v. United States, 271 U.S. 268, 271, 46 S.Ct. 500, 70 L.Ed. 941 (1926).

17. Dixie Highway Express, Inc. v. United States, 268 F.Supp. 239, 241 (S.D.Miss. E.D.1967).

18. Mary Carter Paint Co. v. FTC (concurring opinion), 333 F.2d 654, 660 (5 Cir. 1964). cert. den. 379 U.S. 957, 85 S.Ct. 661, 13 L.Ed.2d 553.

herein. This court therefore vacates, annuls, and sets aside the Decision and Order of the Interstate Commerce Commission and remands this case for such further proceedings, including the taking of further evidence if necessary, as the Commission may deem necessary for its subsequent Decision and Order, in the light of our instant ruling.

The plaintiffs have here urged that when the Commission permitted Commissioner Murphy, who had acted as Examiner, to sit on Division I of the Commission, they were denied the guarantees of the Administrative Procedure Act and due process under the Fifth Amendment.

After Commissioner Murphy issued his initial Report and Recommended Order of June 9, 1966, and after the filing of exceptions thereto by some of the plaintiffs herein, Division I of the Commission with Commissioner Murphy sitting as chairman, affirmed and adopted Murphy's own findings and conclusions, and granted the applications, just as he recommended. The record indicates that it was not until the filing of their complaint in this court that the plaintiffs raised the issue that such a procedure was a denial of procedural due process.

Plaintiffs' cry of prejudice comes too late. The plaintiffs herein knew that Commissioner Murphy was the chairman of Division I, the Division which normally would handle the Hawaii proceedings. Nevertheless no objection was filed either before or after the Division's Decision and Order. A petition was filed by one or more of the plaintiffs under Rule 101 (a) (4) of the Commission's General Rules of Practice—without any allegation of error because of Commissioner Murphy's dual role. A petition to the Commission for extraordinary relief under Rule 102 of the Commission's General Rules of Practice was also available, but no action was ever taken by the plaintiffs —until their complaint in this court. However, this court's decision now renders plaintiffs' contention moot, and we make no ruling thereon.