HC&D MOVING & STORAGE COMPA-
NY, INC., et al., Plaintiffs,

v.

UNITED STATES of America and Inter-
state Commerce Commission,
Defendants.

De Witt Transfer & Storage Company,
Intervening Defendants.

De WITT TRANSFER & STORAGE
COMPANY et al., Plaintiffs,

v.

UNITED STATES of America and Inter-
state Commerce Commission,
Defendants.

HC&D Moving & Storage Company,
Inc., et al., Intervening
Defendants.

Civ. Nos. 72-3647, 72-3703.

United States District Court,
D. Hawaii.

April 22, 1974.

As Modified March 3, 1975.

Alan F. Wohlstetter, Stanley I. Goldman, Denning & Wohlstetter, Washington, D. C., A. Peter Howell, Honolulu, Hawaii, for plaintiffs HC&D Moving & Storage Co., Inc., and others.

Thomas E. Kauper, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Harold M. Fong, U. S. Atty., Honolulu, Hawaii, for United States.

Fritz R. Kahn, Gen. Counsel, Betty Jo Christian, Assoc. Gen. Counsel, Washington, D. C., for Interstate Commerce Commission.

Robert G. Dodge, Kai, Dodge & Evensen, Honolulu, Hawaii, for all intervening defendants.

Warren N. Grossman, Los Angeles, Cal., F. Neil Aschemeyer, St. Louis, Mo., John C. Bradley, Washington, D. C., Herbert Burstein, New York City, Donald A. Morken, Minneapolis, Minn., Paul F. Sullivan, Washington, D. C., Joseph P. Tuohy, Chicago, Ill., James L. Beattey, Indianapolis, Ind., Charles Ephraim, Washington, D. C., for De Witt Transfer & Storage Co., and others.

Before BARNES, Circuit Judge, and PENCE and KING, District Judges.

These consolidated cases are actions for review of different portions of the decision of the Interstate Commerce Commission in Motor Carrier Operations in the State of Hawaii, 115 M.C.C. 228 (1972). By its decision, the Commission: (1) granted certificates of public convenience and necessity to 18 mainland-based household goods carriers authorizing operations within Hawaii; (2) determined that the previously exempt movement of household goods between points in Hawaii by carriers engaged solely in operations within Hawaii should be subjected to ICC regulation; and (3) granted certificates of public convenience and necessity to 6 Hawaii-based carriers who had theretofore operated under the exemption.

In Civil 3647 (hereinafter referred to as *HC&D*), 14 plaintiffs—primarily Hawaii-based carriers,[1] including those six which received certificates—challenge the awards of Hawaii operating authority to the mainland-based carriers. In Civil 3703 (hereinafter referred to as *De Witt*), some of the mainland carriers who received certificates challenge the removal of the exemption and the grants to the Hawaii-based carriers.

The actions are brought pursuant to 28 U.S.C. §§ 1336, 1398,[2] 2284 and 2321–2325 (the Judicial Code); 49 U.S. C. §§ 17(9) and 305(g) (Interstate Commerce Act); and 5 U.S.C. §§ 701–706 (Administrative Procedure Act).

■ Preliminarily, this court is fully apprised of the limited scope of judicial review of ICC orders. A reviewing court's role is "limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done. Unless in some specific respect there has been prejudicial departure from requirements of the law or abuse of the Commission's discretion, the reviewing court is without authority to intervene."[3] The court is not permitted to substitute its judgment for that of the ICC by weighing de novo the evidence presented to the Commission.

---

1. The list of plaintiffs in the *HC&D* case also includes North American Van Lines, a mainland carrier which claims to be "successor-in-interest" to the former Hawaii-based carrier, Trans-Pacific.

2. The complaint in the *De Witt* case was originally filed in the United States District Court for the Central District of California, pursuant to the venue provisions of 28 U.S.C. § 1398. The case was thereafter transferred to this court, by stipulation of the parties, because of the relationship with the issues in the *HC&D* case, already filed in this court.

3. United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535–36, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946).

In reviewing the action of an administrative agency, the test is whether the agency's conclusions are supported by substantial evidence of record.[4] Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."[5] It would not be a sufficient basis therefore, for reversal of the Commission's action that this court—if it were permitted to do so—might reach a different conclusion than the Commission reached.

Of the three sources of error alleged in the complaints, only one appears materially substantial: the claim in HC&D that the grant of certificates to the mainland-based carriers was improper. Section 207(a) of the Act, 49 U.S.C. § 307(a) gives the Commission authority to issue such certificates:

. . . [A] certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found . . . that *the proposed service . . . is or will be required by the present or future public convenience and necessity*; otherwise such application shall be denied . . .. (Emphasis added.)

The Commission in 1936 in Pan-American Bus Lines Operation, 1 M.C.C. 190, enunciated the burden of proof upon an applicant in a proceeding of the type here considered. The Commission stated:

The question, in substance, is whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by applicant with the new operation or service proposed without endanger-

ing or impairing the operations of existing carriers contrary to the public interest. (Page 203)

Here, the cornerstone of the Commission's grants of authority to the mainland applicants was its finding of a need for "a coordinated door-to-door, motor-water-motor containerized service with single-carrier responsibility" which the mainland carriers are in a position to offer. 115 M.C.C. at 253. The Commission acknowledged that shipments of used household goods can and do presently move in a very similar fashion *absent* the proposed authority, 115 M.C.C. at 253, and in describing the current transportation situation, stated:

At present, virtually all used household goods move between Hawaii and the mainland under single factor, motor-water-motor rates, principally in the door-to-door container service offered by freight forwarders . . . . Local Motor carriers of household goods perform the motor transportation as well as involved accessorial services within Hawaii. 155 M.C.C. at 237.

It found that even if the mainland certificates are granted, the "local carriers will still be relied upon in the main to perform the physical transportation services required within Hawaii . . . ." 115 M.C.C. at 253.

It appears that the above factors, triggering the query as to what more the public would be offered through the award of the contested certificates than is presently available, caused the hearing examiner in these proceedings to recommend denial of the mainland applications. Burnham Van Service, Inc., Extension-Hawaii, No. MC–682 (July 9, 1971). The examiner noted that "applicants presently under a through bill of lading and through rate offer single carrier responsibility and stress that all phases of the operation are their own." MC–682 at 34. As a result, he conclud-

---

4. 5 U.S.C. § 706(2)(E).

5. Consolo v. Federal Maritime Comm'n., 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed. 2d 131 (1966).

ed, "even if the applications are granted it cannot be said that service offered to the public will be superior in any material respect to that presently available by existing carriers." *Id.* at 36.

This problem of the apparent coincidence between presently available service and that which would be offered under the certificates was one of the bases upon which this court set aside an earlier grant[6] by the ICC of Hawaii operating authority to almost all of the present mainland applicants.[7] In HC&D Moving & Storage Company v. United States, 298 F.Supp. 746 (1969), this court stated:

> It is thus manifest from Commissioner Murphy's findings that the same method of operation theretofore utilized by Hawaii-based carriers vis-a-vis the mainland carriers was expected to continue after the Commission made its decision—no matter whether it granted or denied the applications of the mainland carriers.
>
> [T]he Commission anticipated that the Hawaii-based carriers would continue to handle the Hawaii land operations for the mainland applicants just as they had done theretofore. 298 F. Supp. at 749–50.

■ The essence of the case before us now is thus whether after further hearings, the Commission has developed sufficient evidence and articulated findings adequate for this court to determine whether or no the Commission could reasonably conclude that the proposed new service will in fact serve a useful public purpose or need which cannot be served as well by existing carriers.[8] Notwithstanding the deference owed to the Commission's actions, if the agency's conclusions are unsupported in reason and in the record, we have no choice but to set aside what has been done.

■ In evaluating the Commission's findings, the most obvious difference between the present and proposed services is that the certificates would make possible the movement of household goods under *motor carrier* authority, whereas presently such goods move primarily through freight forwarders operating under a statutory exemption from ICC regulation. 49 U.S.C. § 1002(b)(2). When used household goods move under motor carrier authority, the carrier is subject to the full panoply of Commission regulations designed for the protection of the public. These regulations, 49 C.F.R. 1056, include rules on the use of estimates (§ 1056.8), on prompt dispatch (§ 1056.12), and on the handling of claims for loss or damage (§ 1056.17). The Commission stated:

> Granting authority to household goods motor carriers willing to assume full responsibility for a through movement of household goods to or from Hawaii will place the movement more securely under our regulatory control and will allow us to take whatever actions may be necessary to assure the provision of sound and responsible through intermodal service to the public. Ex Parte No. MC–59 at 253.
>
> The coordination available from exempt freight forwarders is outweighed, we believe, by their lack of regulation by this Commission and by our present inability to enforce against these forwarders our special household goods regulations which were promulgated to protect the public. Ex Parte No. MC–59 at 254.

Such diversion of exempt traffic into regulated status unquestionably furnishes a reasonable basis upon which the Commission may rely.

Plaintiffs argue, however, that many of the freight forwarders have now become subject to Commission regulation

---

6. 103 M.C.C. 372 (1966).

7. A close examination of the first HC&D decision will show that the Commission's unjustified departure from the *Mollerup* rule was not the sole basis on which the court relied in setting aside the Commission's action.

8. See Pan-American Bus Lines, *supra.*

through the issuance of regulated freight forwarder permits, and that the extension of ICC regulation and control over the shipment of household goods to and from Hawaii has largely been accomplished, thus invalidating the alleged basis for the grants involved here. In weighing this argument and plaintiffs' authorities therefor, we find that American Movers Conference v. United States, 307 F.Supp. 74 (C.D.Cal.1969), cited by plaintiffs as an instance of the spread of *regulated* freight forwarder operations, indicates that the regulations apply only to those forwarders whose operations involve those items, *i. e.*, used automobiles and unaccompanied baggage, not falling within the definition of "used household goods." Forwarders whose operations satisfy the "household goods definition" continue to be exempt. In addition, even were household goods shipments subject to freight forwarder regulation, plaintiffs have not demonstrated that those regulations offer the consumer the same degree of protection that the motor carrier rules provide, and, certainly, we are not about to engage here in a section by section comparison of the two sets of rules. The Commission has seen fit to provide a special set of detailed rules covering the shipment of used household goods by motor carriers, and such rules do not apply to freight forwarders.

■■ Plaintiffs also argue that the Commission's theory of converting an exempt operation to a regulated one is faulty because freight forwarders—including affiliates of many of the applicants—can continue to operate. It cannot here be disputed that exempt forwarder operations may legally continue, but this fact, *per se,* does not void the Commission's rationale. The Commission's finding in this particular must be upheld if the Commission had a reasonable basis for concluding that the issuance of motor carrier authority would extend the scope of its regulatory authority for a useful public service or need.

It is not required that forwarder operations vanish from the Hawaii-mainland household goods transportation field. Nor does the Commission's decision so mandate it. By the plaintiffs' own admission, much of the present freight forwarder activity is generated by affiliates of the very mainland applicants who have labored for so long and at such great expense to secure the certificates under dispute in this lawsuit. It is inconceivable that those applicants would not avail themselves of the motor carrier authority, were it granted. As the Commission concluded, the competitive advantage of being able to offer the public through service with true single-*carrier* (as opposed to forwarder) responsibility should encourage the companies to exploit their authority and the public, preferentially, to use the service thus provided.

■ Plaintiffs also contend that no new regulatory purpose will be served by the grants of motor carrier authority since, even in the freight forwarder situation, the underlying physical transportation of the goods is performed by carriers who are subject to the ICC's household goods regulations. While this may be so, it remains that customers who use the services of freight forwarders may well be unaware of their rights against the actual goods carriers. In addition, there can be no doubt that the claims situation is complicated by the presence of multiple transporting entities, any or many of which may be responsible for all or part of a loss.

We can but find, therefore, that there is, in fact, a rational basis for the Commission's conclusion that "claims could not be settled as easily without the single-carrier responsibility [the mainland carriers] would provide." 115 M.C.C. at 254.

■ The Commission further found that the grants of new authority "will not interfere with the competitive balance that presently exists in Hawaii." 115 M.C.C. at 254. Plaintiffs, however, express the fear that the mainland car-

riers will use the new authority to establish their own physical facilities in Hawaii, thereby damaging or destroying the business of some if not all of the locally-based companies. As we noted earlier, the Commission's view was that "the local carriers will still be relied upon in the main to perform the physical transportation services required within Hawaii." 115 M.C.C. at 253. The Commission apparently expected that the mainland carriers would for the most part cultivate agency relationships with the local companies, referring to the greater control the mainland-based companies will have over shipments when the local firms are serving "as the former's agents." 115 M.C.C. at 253. This view is also supported in the findings of the hearing examiner,[9] who noted that "most applicants have indicated a firm future intention to continue to have agency representations in Hawaii even if authority here sought is granted." MC–682 at 34.

The possibility, or even the probability, that some of the mainland-based carriers will initiate their own physical operations in Hawaii is not sufficient to upset the Commission's finding. As The Court has stated in Schaffer Transportation Co. v. United States, 355 U.S. 83, 91, 78 S.Ct. 173, 178, 2 L.Ed.2d 117 (1957): "[T]he public [should not] be deprived of a new and improved service because it may divert some traffic from other carriers."

Plaintiffs additionally maintain that if they enter into agency relationships with the mainland carriers they will lose the freedom to set their own rates, since under 49 C.F.R. 1056.18 an agent may not establish rates different from those of its principal. We fail to see why this should upset the competitive balance. Even if the mainland principals go so far as simply to dictate to their local agents the rates the latter may charge, it is inconceivable that the rates would be set without regard for the need, on the one hand, of the local carrier to make a profit and, on the other, of both agent and principal to offer an attractive yet profitable rate to the public.

Plaintiffs cited two Commission proceedings in which applications were denied in apparently similar circumstances. Plaintiffs' Opening Brief at 46–50. In United Van Lines Inc. Extension-Alaska, 99 M.C.C. 331 (1965), the ICC denied applications of continental carriers to carry on Alaskan operations on the basis that existing services had not been shown inadequate. In Trans-Caribbean Motor Transport, Inc. Common Carrier Application, 66 M.C.C. 593 (1956), the Commission denied an application to serve certain Florida ports on shipments moving in the Puerto Rican trade because, again, the shippers failed to show inadequacy of existing services.

In the case before us, the ICC expressly stated that it was not premising the grants on a finding that present service was inadequate. 115 M.C.C. at 254. Moreover, the promulgation of the household goods regulations did not occur until after both the cited decisions. The desire to have these regulations apply to the mainland-Hawaii trade was one of the bases of the Commission's decision here.

In sum, we find the Commission adequately justified the grants of certificates of public convenience and necessity to the mainland applicants in the challenged proceedings. The Commission's action in this regard is hereby affirmed.

The matters involved in the *De Witt* complaint may be simply disposed of. First, it is alleged that the Commission acted improperly in modifying the 1960 exemption under which household goods carriers engaging solely in operations within Hawaii were free from ICC regulation. This action had been taken pursuant to § 204(a)(4a) of the Interstate

---

9. The hearing examiner's findings were adopted by the Commission, except as supplemented or modified in the Commission's own discussion. 115 M.C.C. at 236.

Commerce Act, 49 U.S.C. § 304(a)(4a), which requires the Commission to grant an exemption upon a determination that

. . . the transportation in interstate or foreign commerce performed by any motor carrier or class of motor carriers lawfully engaged in operation solely within a single State is in fact of such nature, character, or quantity as not substantially to affect or impair uniform regulation by the Commission of transportation by motor carriers engaged in interstate or foreign commerce in effectuating the national transportation policy declared in this Act.

The Commission originally found that there was "little, if any, substance of record indicating that either safety or economic conditions are such as to require Federal regulation." 84 M.C.C. at 31–32.

 In the proceeding now before us, by contrast, the Commission found that since 1960 there had been "changes in the nature, character, and quantity" of household goods transportation in Hawaii, and that the industry had "reached such proportions as now to be of such a quantity as substantially to affect or impair uniform regulation by this Commission." 115 M.C.C. at 248, 249. Among the factors entering into the Commission's conclusion were the growth in population and its spread to more distant parts of the island of Oahu; the increase in household goods shipments to and from Hawaii; the rise of the containerization method of moving household goods; the extension of ICC jurisdiction over joint motor-water-motor rates; and the recently promulgated household goods regulations. 115 M.C.C. at 249–51. These factors, elaborated on in the Commission's decision, provide ample justification for the removal of the exemption. The Commission's action is Affirmed.

The remaining allegation of the *De Witt* complaint is that since the exemp-

tion should not have been removed, there was no need to grant motor carrier authority to the Hawaii-based carriers. Inasmuch as we have found the removal of the exemption to have been warranted, consideration of the certification of the Hawaii carriers was clearly proper, and the award of carrier authority was equally proper. The six carriers in question have extensive facilities in Hawaii and have been actively participating in local operations. The grant of motor carrier authority merely allows them to continue offering a service that serves and satisfies an obvious public need.[10]

The decision of the Interstate Commerce Commission in Motor Carrier Operation in the State of Hawaii is affirmed in its entirety.