**ARKANSAS-BEST FREIGHT SYSTEM, INC., an Arkansas corporation, et al., Plaintiffs,**

**Roadway Express, Inc., et al., Intervening Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

**Red Ball Motor Freight, Inc., et al., Intervening Defendants.**

**No. FS–72–C–65.**

United States District Court, W. D. Arkansas, Fort Smith Division.

Sept. 11, 1973.

On Motion to Amend Judgment Oct. 4, 1973.

See also D.C., 350 F.Supp. 539.

Don A. Smith, Harper, Young & Smith, Fort Smith, Ark., Drew L. Carraway, Rice, Carpenter & Carraway, Washington, D. C., Phineas Stevens, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Miss., Robert E. Joyner,

Joyner, Goff & Simms, Memphis, Tenn., Phillip Robinson, Robinson, Felts, Starnes & Nations, Austin, Tex., Frank W. Taylor, Jr., Reeder, Dysart, Sanders & Taylor, Kansas City, Mo., M. Ward Bailey, Christopher, Bailey & Taylor, Fort Worth, Tex., William O. Turney, Turney & Turney, Washington, D. C., for plaintiffs.

Robert E. Johnson, Acting U. S. Atty., Fort Smith, Ark., Fritz R. Kahn, Gen. Counsel, I.C.C., Seymour Glanzer, Atty., I.C.C., Washington, D. C., for defendants.

Donald E. Cross, Rea, Cross, Knebel, Washington, D. C., Maurice F. Bishop, Bishop & Carlton, Birmingham, Ala., Jerry C. Prestidge, Clark, Thomas, Harris, Denius & Winters, Austin, Tex., Courts Oulahan, Rhyne & Rhyne, Washington, D. C., Robert L. Jones, Jr., Jones, Gilbreath & Jones, Fort Smith, Ark., for intervening defendants.

Before MEHAFFY, Circuit Judge, and MILLER and WILLIAMS, District Judges.

JOHN E. MILLER, Senior District Judge.

The plaintiffs, 19 in number, bring this action to set aside, vacate, suspend, enjoin and annul that portion of the order of the Interstate Commerce Commission (ICC) that authorizes the issuance of a Certificate of Public Convenience and Necessity to Red Ball Motor Freight, Inc., in Docket No. MC–2229 (Sub-No. 132), to Bowman Transportation, Inc., in Docket No. MC–94201 (Sub-No. 56), and to Johnson Motor Lines, Inc., in Docket No. MC–106401 (Sub-No. 18) (hereinafter referred to as Red Ball, Bowman and Johnson, respectively, or applicants collectively). The applications were consolidated with others under Docket No. MC–1124 (Sub-No. 206) which was initially entitled "Herrin Transportation Company, Extension-Atlanta, Ga.," and was re-entitled "McLean Trucking Company, Extension-Atlanta, Ga."

This action was commenced pursuant to 28 U.S.C.A. § 1336, conferring jurisdiction upon this court, and §§ 2284 and 2321 through 2325, inclusive, of said Title, together with 49 U.S.C.A. §§ 305(g), 305(h), and 5 U.S.C.A. §§ 701 through 706, the Administrative Procedure Act, all providing for the procedure herein.

Venue exists under 28 U.S.C.A. § 1398, since plaintiffs Arkansas-Best Freight System, Inc., and Mercury Motors, Inc., are residents of and maintain their principal offices and places of business in Fort Smith, Arkansas.

On October 12, 1972, Red Ball, upon motion was allowed to intervene as a party defendant, and on October 12 it filed its original answer, and on December 4, 1972, filed its first amended answer. In the first amended answer, it alleged that the Commission entered an order on October 6, 1972, denying the petitions of plaintiffs seeking a finding that an issue of general transportation importance is involved in the proceeding.

On October 12, 1972, the court, upon motion, allowed Johnson to intervene as a defendant, and on the same day it filed its answer in which it denied that certain of the plaintiffs had appeared as protestants in opposition to the granting of the operating authority applied for by it.

On October 25, 1972, Bowman, upon motion, was allowed to intervene as a defendant, and on the same date it filed its answer, in which it alleged that certain of the plaintiffs did not file a petition for reconsideration in the proceedings.

On October 31, 1972, the court, upon motion, granted Roadway Express, Inc., and Roadway Express, Inc., of Mississippi permission for leave to intervene as plaintiffs.

On November 1, 1972, the court allowed a group of shippers, 41 in number, who had appeared as witnesses before the Commission on behalf of the Johnson application, to intervene in support of the application.

On December 4, 1972, defendants USA and ICC filed their joint answer.

On January 2, 1973, the court, upon motion, granted Jack Cole-Dixie Highway Company leave to intervene in support of the plaintiffs' complaint.

The authority granted Red Ball, Bowman and Johnson authorizes such carriers to extend their existing operations in the transportation of general commodities by motor vehicle over regular routes between specific points, generally in the Southeastern and Southwestern portions of the United States. Each plaintiff and intervening plaintiff is a motor carrier that participated in the proceedings before the Commission as a protestant in opposition to one or more of the applications granted by the Commission.

Promptly after the filing of the complaint, a hearing was held before Senior District Judge John E. Miller on plaintiffs' application for a temporary restraining order suspending the operation of the Commission's orders pending a final hearing and determination of this action. The temporary restraining order was issued pursuant to 28 U.S.C.A. § 2284(3). Arkansas-Best Freight System, Inc. v. United States, 350 F.Supp. 539 (1972).

After extensive briefs had been filed by all parties, plaintiffs sought to supplement their complaint so as to seek review of orders of the Commission issued subsequent to the filing of the initial complaint. The subsequent orders granted operating authority to a fourth motor carrier, Jones Truck Lines, Inc., on its application heard as a part of the consolidated proceeding that resulted in the issuance of authority to Red Ball, Bowman and Johnson. Jones Truck Lines, Inc., Extension-Atlanta, Ga., 117 M.C.C. 586. The motion to file the supplemental complaint was denied, after a full hearing before the court. (Appendix A.)

In 1965, the Commission published notices describing the filing of a number of extensive motor carrier applications. Following a pre-hearing conference, ten out of twenty-one applications considered at the conference were selected for hearing on a consolidated record. These applications involved an extensive network of routes extending generally across the Southeastern and Southwestern portions of the country. Carriers operating predominantly in the Southeast sought to extend their operations into the Southwest. Carriers operating in the Southwest sought extensions into the Southeast. Most of the applications were filed within a short period of time and it is obvious that some were primarily defensive in nature. For example, applications by Southeastern carriers to serve major points in the Southwest were met by applications by Southwestern carriers to operate over the same routes to serve points in the Southeast presently served by the Southeastern applicants. Initially, each applicant, including Red Ball, Bowman and Johnson, opposed the other applications that sought to duplicate their own routes, but in prosecuting their applications, the various applicants adopted different strategies. Some concentrated on their role as protestants in opposition to the others. Some, including Bowman (a Southeastern carrier), abandoned their role as protestants and concentrated on their role as applicants. Johnson (a Southeastern carrier) emphasized its role as applicant, but remained as a protestant in other proceedings. Red Ball (a Southwestern carrier) maintained its dual role of applicant and protestant throughout the proceeding, dividing its presentation of evidence accordingly.

The consolidated proceeding was assigned for hearing before two Hearing Examiners (now termed Administrative Law Judges) who conducted hearings over a period of eighteen months in Washington, D. C., Atlanta, Ga., Dallas and Houston, Texas, New Orleans, La., Kansas City, Mo., Tulsa, Okla., and Memphis, Tenn., such cities (other than Washington) being located on the various routes involved in the applications. The hearing resulted in "what is perhaps the most extensive record ever developed in connection with a single

group of motor carrier application proceedings before this Commission." 114 M.C.C. at 573. The transcript of testimony covers 23,423 pages and there are 1,989 exhibits. A total of 950 witnesses testified on behalf of the ten applicants, including 933 public witnesses engaged in shipping or receiving freight by motor carrier.

A total of 66 rail and motor carriers entered appearances in opposition to the applications. Forty-eight of the protestants offered evidence through the testimony of 62 witnesses and numerous exhibits.

Extensive briefs were filed before the Examiners. These briefs included two sets of detailed abstracts of the evidence, one submitted jointly on behalf of Bowman, Johnson and Jones; the other submitted jointly on behalf of various applicants and protestants, including Red Ball and plaintiffs. The two sets of abstracts are strikingly similar and provide an accurate summary of the evidence of record.

The parties required seven months for the preparation of their post-hearing briefs, following which the Examiners issued their report and recommended order on November 19, 1969, twenty-seven months after the close of the hearing. The Examiners concluded that none of the applicants had established that its application was justified by the public convenience and necessity, concluding, instead, that approval of any of the applications would result in a deterioration rather than an improvement of existing carrier service, contrary to the public interest. They recommended, therefore, the denial of all applications.

On the day preceding the extended due date for the filing of exceptions to the Examiners' report, a petition was filed with the Commission in the name of forty-one shippers that had testified at the hearing in support of the Johnson application. This petition sought to intervene in support of Johnson and to file exceptions challenging the Examiners' denial of that application. Seven days later, before replies thereto could be filed, the Commission entered an order granting such petition and accepting such exceptions, *nunc pro tunc*. Vigorous objection to such action, advanced by numerous protestants, was subsequently denied by the Commission.

Eight applicants filed exceptions to the Examiners' report. Some protestants filed conditional exceptions, taking issue only with the failure of the Examiners to make certain findings of fact. Replies to the exceptions were filed by numerous parties.

Twenty-five months after the Examiners' report, Division 1, composed of three of the eleven Commissioners, issued a report granting the applications of Red Ball, Bowman and Johnson, and sustaining the Examiners' denial of the remaining applications. 114 M.C.C. 571. The grant to Bowman exceeded, in certain respects, the authority described in its application. The Commission, accordingly, required that an additional notice be published in the Federal Register describing such grant.

Pursuant to the Commission's Rules of Practice, extensive petitions seeking reconsideration of the Division 1 report were filed on behalf of numerous protestants and most of the unsuccessful applicants. Twelve working days after replies thereto were filed, all petitions challenging the grants to Red Ball, Bowman and Johnson were denied by a two-to-one vote of the Commission's Division 1, then acting in an appellate capacity. This order also overruled petitions of Arkansas-Best Freight and others, filed pursuant to the publication of notice of the Bowman grant, seeking leave to intervene, reopening for further hearing, and reconsideration in light of evidence to be adduced at the further hearing. The same order also denied the petitions of the unsuccessful applicants other than Jones, but reopened the Jones application for further consideration on the existing record. Subsequent to the filing of this suit, the same Division, again by two-to-one vote, reversed its prior decision and granted the Jones application with certain modifications. *Jones Truck*

Lines, Inc., Extension-Atlanta, Ga., supra.

The Commission's disposition of the Red Ball, Bowman and Johnson applications became administratively final with the entry of the order overruling protestants' petitions for reconsideration, whereupon this suit was promptly instituted by the leading protestant carriers. Subsequently, the Commission denied various petitions requesting the Commission to find on its own motion that the proceeding was one involving an issue of general transportation importance.

Extensive and thorough briefs have been submitted to the court in support of the respective contentions of the parties in interest and proposed findings of fact and conclusions of law have been received, which the court has studied, along with a great many of the exhibits and the Report of the Examiners and the Division 1 Report.

After full consideration of the contentions of all the parties, the pertinent portions of the entire record, and the proposed findings of fact and conclusions of law submitted by the parties, the court is convinced that the proposed findings and conclusions submitted and requested by plaintiffs are correct, and they are adopted by the court as hereinafter set forth.

### THE EXAMINERS' REPORT

All parties, in their briefs and pleadings, acknowledged that the Examiners were among the most experienced on the Commission's staff. Their 300-page report consisted of a summary of their findings and conclusions, together with a series of appendices embodying extensive, detailed findings of fact. As summarized in the Examiners' Report, the ten applicants proposed to extend their operations into new areas so as to handle traffic, in direct service, moving between points that they presently serve and points that they propose to serve. Bowman and Johnson, for example, that operated primarily in the Eastern Seaboard states and sought to extend their operations over described routes so as to serve new points located west of their existing territory. The principal routes sought by Johnson extended from Atlanta to the Dallas-Ft. Worth area, and from New Orleans to Houston. Johnson sought to serve the principal cities along these routes in Mississippi, Louisiana and Texas. Bowman sought to extend its routes from Alabama to Dallas-Ft. Worth and to Houston, duplicating basically the Johnson proposal, and, in addition, proposed other routes extending across Mississippi, Arkansas and Missouri, with the northern route terminating at Topeka, Kansas. Red Ball's existing authority extended over large areas in the Southwest. It sought to extend its routes from Jackson and Greenville, Mississippi, eastward to Birmingham and Atlanta. The application of the other Southeastern carriers basically duplicated that of Johnson, and the applications of the remaining Southwestern carriers basically duplicated that of Red Ball.

None of the applicants proposed to provide service to any point not presently served by multiple motor carriers. Each sought only to provide additional service to that presently available. Each proposed a limited "overhead" type of service to the major cities only along their proposed routes on long-haul traffic moving to or from points presently served by each applicant. No "local" traffic [i. e., traffic from one point to another on the proposed routes] would be handled, and no service would be rendered to the smaller towns and communities along the proposed routes.

Each applicant presented "operating testimony" designed to demonstrate its willingness and ability to perform its proposal. A large number of shippers and receivers of freight were then presented to support applicants' contentions that there is a public need for the proposed service. Each applicant proposed to perform service within prescribed periods of time, referred to as "transit time." Each sought to establish that its proposed transit times are

less than the transit times actually experienced by its witnesses in the shipping and receiving of freight. Most shippers generally expressed dissatisfaction with inconsistent and excessive transit times. They also expressed other criticisms of existing service, including the pickup and delivery of shipments. It was also shown that certain carriers maintain various types of formal or informal restrictions as to certain types of traffic, while others fail to render consistent service to authorized points, primarily the smaller towns and off-route points in the area. Much of the traffic involved in the proposals moved over extremely long distances and throughout wide geographical areas. Bowman and Johnson, for example, operated from New England to the Southeast and proposed extensions into the Southwest and Midwest. Red Ball operated from as far west as Denver and proposed an extension to Atlanta. The proposals of other applicants were equally extensive. Although, between many points, direct or "single-line" service is available, most points, particularly the most distant points, are joined only by "joint-line" service involving an interchange or interline between two or more connecting carriers. Most of the criticism involving existing service centered around delays and uncertainties inherent in joint-line service. The applicants emphasized their proposal to reduce the amount of joint-line service required for the handling of movements between the involved points.

Approximately one-half of the Examiners' 300-page report consisted of detailed findings of fact based upon the evidence presented by the public witnesses. These findings were grouped or separated by the Examiners in accordance with the various types of freight shipped by the witnesses. The commodities involved in such testimony covered a wide spectrum, as evidenced by the Examiners' classification of such freight into forty-five categories. Although, on exceptions, no party challenged the accuracy of any finding of fact embodied in the Examiners' report, certain applicants contended that the Examiners' method of grouping their findings in this manner prevented such evidence from receiving "adequate consideration and treatment in relation to the the territories and points involved." 114 M.C. C. at 591. The method used by the Examiners, however, was consistent with the method used by counsel for applicants and protestants in their respective abstracts of the evidence presented to the Examiners. It was also consistent with the order of the Commission establishing a special procedure for the presentation of such evidence, which order required the use of modified written statements including for each witness a "description of traffic and special transportation requirements if any." Consideration of shippers' testimony by commodities has been followed in other proceedings. Compare, United Parcel Service, Inc., Common Carrier Application, 68 M.C.C. 199, 203.

Typical of the Examiners' findings is their summary of the evidence presented by thirty-three witnesses who ship or receive clothing, the first commodity category considered in their report. After setting forth detailed findings concerning the testimony of each of these witnesses, the Examiners found:

"These 33 Clothing witnesses are not without available transportation services. Their support is based upon the inadequacies of those services. For the most part their shipments are in small lots and the product is seasonal in its salability. Inventories necessarily are limited because of economic considerations. Orders often are of an emergency nature such as to meet a certain advertised sale, or are reorders of depleted stock. The availability, dependability and speed of transportation service are very real factors in determining the competitive position of these shippers in a particular market area. Yet, many of these witnesses are not familiar with the existing transportation services available, have not tried the joint-line services

of the carriers they support for single-line service nor the services available from other carriers, are using joint-line services at times when single-line is available, and few have made any real efforts to solve their transportation problems. To a large degree the schedules proposed by the particular applicant supported form the bases of their support." (Examiners' report, App. C, p. 6)

Similar findings were next made concerning witnesses who shipped or received piece goods, textiles, toweling, thread and yarn. The varying transportation requirements of the different shippers is illustrated by the Examiners' findings relative to the next group, those interested in the movement of signs, displays, and showcase equipment. The Examiners pointed out that the support of these shippers "is based primarily upon the assumption that single-line service is better than connecting line service and that the elimination of interchanges between carriers will solve most of their problems merely by reduction in the amount of in transit handling of their shipments." The Examiners pointed out, however, that this assumption "is not justified," because movements "even between points on the lines of a single carrier, may well involve a considerable amount of consolidation and break-bulk distribution between origin and ultimate destination." In addition, it was pointed out that under the applicants' proposals, interline service will still be required "to accomplish a substantial portion of their delivery requirements." The Examiners considered significant the fact that the shippers sought primarily to substitute one service for another "in lieu of the abundant existing services which are available to them but which they have made no attempt to utilize even though in many instances the unused or little used routings would appear on their face to be more advantageous." The Examiners concluded their discussion of this testimony by stating that "The territory here considered is provided with an abundance of transportation facilities." (Examiners' report, App. C, p. 23).

Similar findings were made as to each of the other categories of commodities shipped or received by the witnesses.

As noted, the applicants' proposals were predicated upon their contention that an improved quality of carrier service is needed by the public, and their presentation centered predominantly upon a comparison of their proposed transit time with the transit time experienced by their supporting shippers. They sought to establish the general pattern of existing transit time primarily through the presentation of shipping documents evidencing service rendered by existing carriers, summarized in "transit-time studies" presented as exhibits. The Examiners recognize that "shippers are entitled to transportation services which will enable them to move their merchandise or replenish their stock with the least delay and inconvenience consistent with economically and efficient operation of all transportation agencies serving their localities." (Examiners' report, p. 9). Since the ten applications were heard on a consolidated record, however, and since most [initially all] applicants also participated as protestants, the supporting evidence presented by each applicant normally placed in issue the quality of service rendered by other applicants. The Examiners termed this an "anomaly" (p. 10) attributable to the uniqueness of a single hearing involving overlapping proposals by multiple applicants. The Examiners found that most of the witnesses "voice some degree of dissatisfaction" with their existing transit times and summarized this aspect of their testimony as follows:

" * * * Many of the public witnesses so complaining of slow and inconsistent service submitted abstracts of freight bills showing service they have received from some of the carriers used, including applicants, protestants and other carrier services. In some instances these bills were selected specifically to show poor service, or

the abstracts were prepared from records of shipments upon which there had been some difficulty. In other instances they comprised only a few shipments made over a very extensive period of time; and in some instances the bills represented substantially all shipments in a given period between certain points or areas. It was not unusual for the witnesses to have permitted the applicant they supported to select the bills and prepare the abstracts. The transit time studies of these public witnesses reflect many instances of poor transportation service by protestants, applicants, as well as other carriers. They also reflect instances of good service.

\* \* \* \* \* \*

"The number of witnesses complaining of unsatisfactory transit time and inconsistency of service by the transportation agencies being used is impressive at first blush, but palls with analysis. While the many transit time studies of the supporting shipper witnesses reflect numerous instances of service deficiencies, the evidence also discloses that many of the same witnesses have made no investigation of the carrier services available nor experimented with the various combinations of available service to improve their transportation." (Examiners' report, pp. 10–11).

The Examiners noted that if shippers are genuinely concerned about the adequacy of carrier service, they would not continue to follow practices (beyond the control of the carriers) that cause or contribute to service deficiencies. Such practices, admittedly followed by the shippers, include (a) failure to investigate available service, (b) failure to experiment with different available services, (c) use of circuitous routes in lieu of available direct routes, (d) failure to specify routings available to them, (e) the holding of shipments for periodic release, (f) use of slower water or rail service in lieu of faster available motor service, and (g) failure to use available services offered by the very applicants

supported. The examiners found that "little weight" could be accorded such shippers' professed need for improved service. (Examiners' report, pp. 11–12).

Considered collectively or ratably, the number of witnesses in the ten applications appears to be unusually large for proceedings of this type. Consistent with prior findings of the Commission, however, the Examiners noted that:

"Almost every shipper is interested in getting his products to destination as economically and quickly as possible, and is inclined to support the application of any carrier who promises better service than he already has available. As the Commission has noted in other proceedings [Transamerican Freight Lines, Inc.—Purchase (Portion)—Allen Motor Lines, 59 M.C.C. 695, 722, reversed on other grounds, 65 M.C.C. 163], the number of shipper witnesses which an applicant can present at a hearing to testify that their service is inadequate appears to be governed largely by the energy put forth and the expense it is willing to incur." (Examiners' report, p. 12).

The Examiners made extensive findings relative to the availability of existing service, such findings being predicated upon evidence presented by applicants and protestants. They noted that the "need to avoid monopolistic tendencies \* \* \* must be balanced against the wasteful duplication of services and the creation of excessive capacity that would adversely affect the continuance of efficient operation by the existing carrier services." They found that "the benefits which may be realized by some few of the public witnesses supporting any of these applications are far outweighed by the serious adverse effect the granting of these applications, or any of them, may have upon existing carrier services." (Examiners' report, pp. 20, 22).

These ultimate findings were supported by subordinate findings relative to resulting deterioration in specific service performed by individual carriers. They found that "the evidence leaves lit-

tle doubt that some of the smaller carriers likely could not survive." One [Holloway], admittedly rendering adequate and satisfactory service, would likely lose 71 percent of its revenue as a result of a grant to Bowman. Another [Red Line], could be "put out of business." (Examiners' report, p. 20). The Examiners found that the services of the larger carriers would also be jeopardized. For example, one [Gordons] would be affected throughout its system with 58.5 percent of its total revenue being subject to diversion. Over 98 percent of its traffic at certain major terminals would be involved. (Examiners' report, App. D, p. 21). Similar findings were made as to other protestants.

The findings included other specific illustrations of adverse effects. As noted, the applicants proposed a highly selective "overhead" service to the major points only, rendering no service to the smaller points en route. The Examiners noted that diversion of traffic from such major points "will result in a deterioration of service at many of the smaller points * * * which are not proposed to be served directly by these applicants." (Examiners' report, App. D, p. 36).

The Examiners also noted that the traffic flow is imbalanced and that approval of the applications would aggravate this situation, to the detriment of efficient and economical operations. For example, they found that a further imbalance of Roadway's operations, now heavy westbound, would result from approval, and illustrated the importance of this by noting that: "During the first half of 1967 Roadway operated 157 vehicles empty from Texas eastward to Atlanta or beyond. Loss of any of its eastbound traffic from the Texas origins or connecting points will result in greater imbalance." (Examiners' report, App. D, p. 45). It is noted that 157 empty trips during a 6-month period amounts to one each working day.

Throughout their report, the Examiners found that all criticisms of carrier service made by the witnesses was di-

rected as much toward applicants as toward protestants and others.

Throughout their report, the Examiners also noted that many of the problems cited by the witnesses are directly attributable to practices followed by the shipping and receiving public, beyond the control of the carriers.

The Examiners concluded that approval would result in a deterioration rather than an improvement of service, and set forth specific findings concerning steps that could be taken to improve available service:

"The solution to the instances in which the public has been subjected to poor transportation services in the circumstances here involved does not lie in the authorization of additional carrier services but rather in the exercise of more diligence and care by the carriers and shippers." (Examiners' report, p. 13).

" * * * remedial procedures are available other than authorizing additional carriers in an area already served by an adequate number of carriers." (p. 31).

" * * * the national transportation policy does not tolerate the conclusion that all shippers at all points are entitled to single-line service. The traffic involved is of major import to the economy and efficiency of a number of the existing carriers, and to their ability to continue an adequate service to the public under their certificates. Competition with its advantages must be balanced against wasteful duplication and the creation of excessive capacity that would adversely affect the continuation of efficient operations by existing carriers. Moreover, the applicants themselves provide important segments of the existing joint-line services available, and the evidence shows that the shippers could obtain better interline service by more careful attention to desirable routings and gateways and by more cooperation between the carriers. We conclude that the existing carrier services are ade-

quate to meet the reasonable needs of the shippers, and that applicants' proposed services could not improve substantially thereon without materially diverting traffic from existing carriers to the detriment of their service and contrary to the public interest." (p. 32)

## THE EXCEPTIONS

Exceptions were filed by eight applicants. In addition, the Commission accepted the exceptions tendered on behalf of the Johnson shippers. All of these exceptions took issue with the Examiners' conclusions. Certain applicants also argued that the Examiners' method of grouping the shippers' evidence by commodities prevented the Examiners from obtaining a proper grasp of such evidence, and suggested that such findings should have been subdivided according to the geographical location of the witnesses. No exception was taken, however, to any specific finding of fact.

Extensive replies to exceptions were filed by protestants. Since applicants had not challenged any specific findings of the Examiners, the replies sought to demonstrate that the Examiners' conclusions were proper in the light of such findings.

## THE DIVISION REPORT

The Division differed with the Examiners in their conclusion that all applications should be denied, and ordered that the three here involved be granted and the others denied. At no point in its report did the Division reject any of the Examiners' findings of fact. However, the only findings of the Examiners expressly adopted by the Division were those relating to the protestants' evidence. As noted, more than half of the Examiners' report was devoted to specific findings based on evidence presented by the shippers. Noting the objections to the format of the Examiners' report, the Division stated that "a clearer picture of the supporting witnesses' needs in these proceedings * * * can be presented by a grouping of the support-

ing evidence on a geographic basis." The Division "accordingly restated the supporting evidence" in an appendix to its report. 114 M.C.C. at 591.

It cannot be determined from the report whether the Division's "restatement" of such evidence indicates agreement with or rejection of the Examiners' findings. Protestants' efforts to obtain a clarification of the Division's report were unsuccessful. They now assert that the report .is defective because of its vagueness and ambiguities, asserting that it fails to meet the requisites of the Administrative Procedure Act, 5 U. S.C. § 557(c). Plaintiffs' contentions find support in the conflicting assertions set forth in defendants' briefs. Under Johnson's interpretation, the Division's report "does not adopt the findings * * * of the Hearing Officers * * * but, instead, enters entirely new and different findings." Government counsel reads the Division's report differently, asserting that "the Commission's 'restatement' of the facts does not reflect any disagreement with the examiners over what the witnesses said or what the exhibits stated." (Johnson brief, p. 21; Government brief, p. 38). In its subsequent report on reconsideration in *Jones, supra,* the same Division "restated" its findings in the report now under consideration but made it clear that it did not intend thereby to alter such findings since they were expressly adopted. 117 M.C.C. at 590.

The pivotal point of the Division's grant to Red Ball, Bowman and Johnson involved the treatment of evidence relating to the quality of existing service. As noted, applicants contended that the quality of existing service, primarily from a transit-time standpoint, failed to meet the needs of. shippers. In resolving this issue adverse to applicants, the Examiners gave consideration both to the evidence as to transit time presented by the shippers and to the voluminous evidence on the same subject presented by protestants. Although the Division expressly adopted the Examiners' findings relative to protestants' proof, they

reached the conclusion that the transit-time studies presented by the protestants "do not present as valid a picture as those introduced by those witnesses supporting the applications." This conclusion was predicated upon two factual findings as to protestants' studies: "(1) that most either relate to short periods of time or cover traffic handled for specific shippers and (2) that they were made when protestants were confronted with the possibility of grants of authority to additional carriers." 114 M.C.C. at 599.

Plaintiffs contend that this treatment of vital evidence presented in support of their protests was arbitrary, capricious, and an abuse of discretion and, therefore, violative of the provisions of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). This contention is based upon a comparison of the Division's treatment of protestants' evidence with other findings in its report:

1. The Division gave credence to and predicated ultimate conclusions upon the same type of studies presented by applicants that (a) covered periods of time as short as or shorter than those presented by protestants and (b) covered periods of time in which the applications were pending, such periods being, in some instances, more recent than those utilized by protestants. See e. g., 114 M.C.C. 586.

2. The periods of time covered by protestants' studies conformed generally to the periods covered by the shippers' studies.

3. The shippers' studies generally "comprised only a *few* shipments made over a very extensive period of time," whereas all protestants' studies included *all* shipments handled during the periods covered.

4. Whereas shippers, or applicants acting for shippers, picked shipping documents "selected specifically to show poor service" or included only "records of shipments upon which there had been some difficulty," the protestants' studies included all ship-

ments, good and bad. (See Examiners' Report, p. 10).

Plaintiffs further contend that the Division arbitrarily considered only those portions of the shippers' transit-time studies that were favorable to applicants while refusing to consider those portions unfavorable to applicants. This contention is supported by the Division's failure to consider the summaries of the shippers' exhibits prepared by protestants. These summaries of the shippers' evidence demonstrated that service rendered by the applicants was not superior, but in fact was inferior, to that rendered by protestants, and that protestants' service was, on the whole, reasonably expeditious.

Bowman and Johnson both presented transit-time studies for the declared purpose of demonstrating their ability to perform in accordance with their proposals. Red Ball, as a protestant, presented limited studies of this type. At one point in its report, the Division accepted applicants' evidence as substantiating applicants' ability to perform as proposed. However, in disposing of protestants' contentions that, when viewed in their entirety, applicants' evidence demonstrated performance inferior to that proposed, the Division ruled that such evidence could not be considered for the purpose of testing applicants' ability to perform as proposed. Accordingly, the identical evidence offered by applicants was accepted and credited, to the extent favorable to applicants, but rejected as having no probative value when stressed by protestants. Compare 114 M.C.C. at 586 and 611. Bowman, on brief, continues to urge the appropriateness of such evidence as providing the "best comparison" of its present with its proposed service (Bowman brief, p. 65), thereby acknowledging the Division's error in ruling that, to the extent such evidence was unfavorable to applicants, it had no probative value.

The protestants' transit-time studies, discredited by the Division, were given considerable weight by the Examiners.

The Division acted on its own motion in finding that they were entitled to little weight because "they relate to short periods of time," or because they "cover traffic handled for specific shippers," and because "they were made when protestants were confronted with the possibility of grants of authority to additional carriers." The record disclosed that all such exhibits were presented as representative of normal service rendered by the involved carriers. No one challenged this fact at the hearing or on exceptions. In finding that they were entitled to little weight for the reasons assigned, the Division acted *ex mero motu*, thereby depriving protestants of any opportunity to defend their propriety or correct the alleged deficiencies. The condemnation of such studies on the ground that some "cover traffic handled for specific shippers" is particularly unwarranted. Again, this "deficiency" was not suggested by any party; therefore, the sponsors of the exhibit were given no opportunity to explain the inappropriateness of the criticism. Explanations contained in petitions for reconsideration were apparently ignored by a majority of the Division. Regardless of such explanations, however, even a casual examination of the record would have disclosed that all protestant exhibits covering "traffic handled for specific shippers" related to shippers that had testified in support of the applications. They consisted of obviously relevant evidence offered to rebut the shippers' evidence. In like manner, no suggestion had been made by any party that protestants' exhibits did not reflect normal or representative service because they covered "periods subsequent to the notice of the commencement of the hearings in these proceedings." Clearly, applicants could not have challenged them on this ground, since all of applicants' exhibits, accepted and credited by the Division, were subject to the identical "deficiency." Overlooked by the Division were the exhibits presented by one protestant covering periods prior to such notice, as well as subsequent thereto.

(Exhibits 1747–1763). General service exhibits were presented by fourteen different protestants (including Red Ball) and collectively reflected service of more than 120,000 shipments.

The significance of the Division's refusal to consider portions of applicants' evidence reflecting unfavorably on applicants and their stated refusal to afford weight to protestants' service exhibits, is demonstrated by brief comparisons of applicants' service with protestants' service, as reflected by the exhibits. Before the Commission and before this Court, Bowman recommends its service exhibits as offering "the best comparison for the service actually being performed over present and proposed routes." Protestants pointed out to the Division, however, that such exhibits actually establish performance greatly inferior to that proposed. In many instances, Bowman demonstrated that it delivered its traffic on time only 55% of the time. Johnson's on-time performance ranged from 22.5% to 58.5%. These facts were ignored by the Division. They did find, however, the protestants' evidence reflected greatly superior service. For example, as to plaintiff Gordons, the Division found that its record of 5,694 shipments "disclosed 'on-time' performance on 81 percent of the shipments, and that 96 percent were delivered by the first day beyond the established standard." 114 M.C.C. at 768. On 7,885 shipments transported by plaintiff Mercury, its on-time performance "ranges from a low of 76.4 percent to a high of 93.8 percent." 114 M.C.C. at 771. Plaintiff Campbells' on-time performance ranged "from 71.6 percent to 82.4 percent." 114 M.C.C. at 777. Plaintiff Roadway's performance on more than 16,000 shipments "indicates a very substantial on time performance." 114 M.C.C. at 783. Another protestant, on more than 7,000 shipments, established "on time service performance ranging from a low of 80.5 percent to a high of 90.9 percent and an overall average of 86.4 percent." 114 M.C.C. at 790. Various other findings also appear in Appen-

dix G; however, in the body of the Division report, none of these findings are mentioned.

After enumerating various complaints voiced by the shippers, the Examiners found that: "The entire scope of the complaints fall upon both applicants and protestants, as well as upon other carrier services which the witnesses use." (Examiners' report, p. 8). The complaints embraced interline or service restrictions promulgated by Red Ball, Bowman, and Johnson as well as by certain protestants. The Division discussed the complaints as they related to protestants' service, but ignored the admitted fact that they applied equally to applicants' service. For example, the Division specifically condemned certain protestants for promulgating tariff or service restrictions while refusing to mention identical restrictions promulgated by Red Ball, Bowman and Johnson. 114 M.C.C. at 596–8. Evidence of applicants' restrictions appear in the record. In addition, protestants unsuccessfully urged the Division to take note of additional restrictions of this type filed with the Commission by such applicants subsequent to the hearing. In their briefs, applicants, following the Division's pattern, emphasize evidence of deficiencies relating to protestants but ignore identical evidence relating to applicants.

Again acting on its own motion, the Division took official notice of an industry publication which revealed that one protestant discontinued its terminal at one of the involved points subsequent to the hearing. 114 M.C.C. at 605. At the same time, the Division relied strongly upon its finding that Red Ball maintained 92 terminals, "about three times the collective number of terminals operated by" the three other Southwestern carriers. 114 M.C.C. at 602. In view of such findings, protestants urged the Division to notice that the same industry publication cited by the Division revealed the fact that Red Ball had discontinued 35 of the terminals mentioned by the Division. The Division declined to acknowledge this admitted fact. Also ignored was the evidence of record disclosing Bowman's failure to maintain terminals at numerous major cities along its routes, many of which are far larger than the one at which the protestant's terminal was discontinued.

The shipper witnesses testified in support of ten separate applications heard on the consolidated record. In evaluating this evidence, the Division considered all evidence presented in support of the eight applications that were the subject of exceptions. 114 M.C.C. at 591, 592. In considering protestants' evidence, however, the Division compartmentalized such evidence based upon the application or applications specifically opposed by each carrier presenting such evidence. 114 M.C.C. at 605, 607, 609. The Division omitted entirely the Examiners' summary of all evidence presented by six carriers that had protested only the application of one of the carriers that had failed to file exceptions.

At several places in its summary of protestants' evidence, the Division refers to extensions or expansions of certain protestants' operating authority, resulting largely from mergers or acquisitions consummated subsequent to the close of the hearing. At no point in its report, however, does the Division evaluate the effect of this expanded service. More significant is the Division's failure to make any comprehensive evaluation of the scope or extent of all carrier service available at the time of its decision. This is particularly significant because its decision was rendered more than four years after the close of the hearing. Instead of considering the quantum of service available at the time of its decision, the Division referred, instead, to a study presented by Johnson at the opening of the hearing, and concluded that such study disclosed "that comparatively there is a paucity of single-line motor carrier service available." 114 M.C.C. at 592. The study referred to was then more than five and one-half years old. It showed, for example, that only three single-line carriers operated between Atlanta and Dallas, the focal points of the

applications. Actually, however, there were thirteen such carriers operating between these points at the time of the Division's decision. The exhibit relied upon by the Division for its finding concerning the "paucity of single-line motor carrier service available" reflected three carriers authorized to operate between Atlanta and Houston, one between Atlanta and Baton Rouge, and three between Atlanta and Jackson. At the time of its decision, however, eleven were in operation to Houston, seven to Baton Rouge, and eight to Jackson. Similar changes took place between more distant cities. Between Baltimore and Houston, there was an increase from one to seven; between Boston and Dallas the increase was from three to nine; between Charlotte and Dallas, from one to five; between New York and Jackson, from zero to three; between Philadelphia and Houston, from two to six; and between Richmond and Baton Rouge, from zero to three. (See Summary reproduced in plaintiffs' initial brief, pp. 142–5). The Division ignored protestants' pleas that consideration be given to this increased service.

The Division concluded that there is insufficient traffic "to sustain all of the additional motor carrier operations here proposed," and that "the authorization of all such services could lead to unhealthy, if not cut-throat, competition inimical to the public interest." 114 M.C.C. at 601. In concluding that three—and no more—applicants should be granted authority, the Division set forth no basis to support its conclusion that such action would not result in "the creation of excessive capacity and needless duplication of services which would tend to adversely affect the continuance of efficient operation by existing carriers." Although acknowledging this danger, as well as its own admonition "to avoid the proliferation of operating authorities not needed by the shipping public," the Division's conclusions were based upon its finding that, in early 1966, there was a "paucity of single-line motor carrier service available."

As noted, the Examiners found that the selective type of service proposed by applicants would result in a deterioration of service, primarily to the small communities proposed to be traversed but not served by applicants. This finding was carried forward in an appendix to the Division's report, but apparently received no consideration by the Division since it was not otherwise mentioned. 114 M.C.C. at 777.

In like manner, the Division adopted the Examiners' findings that approval would result in a further imbalance in traffic which would result in inefficient and wasteful transportation by increasing the extent of empty vehicle operations. 114 M.C.C. at 783. Again, however, this finding appears only in an appendix and apparently received no consideration by the Division.

The specific findings of the Examiners concerning the adverse effect upon protestant carriers were expressly adopted by the Division. However, such findings appear only in an appendix to the Division's report. In the body of the report, the Division reached conclusions incompatible with such findings. The Division did acknowledge that "undoubtedly" approval of all applications "might have serious adverse consequences on the existing motor carrier services." Next, after acknowledging the possibility of diversion, the Division disposed of this subject as follows:

"With the exception of one carrier (Holloway), however, protestants have not shown that they would be seriously adversely affected [44] [44 In this connection, it is noted that protestant United, one of the carriers the examiners indicated would be adversely affected, has been merged into a much larger carrier, Campbell, thereby rendering the issue as to the vulnerability of the former's operations moot.] by such grants, nor does it appear that the operations of any existing carrier would be impaired to such an extent that they would be unable to render service to the public in the future. Liberty Trucking Co. Ext.—

Lake Mills, Wis., 111 M.C.C. 423 (1970). Whereas the operations of Holloway (which transports specified commodities in a limited territory) may be seriously adversely affected, the gains to be derived by the shipping public in general far outweigh any adverse effect this carrier or any other protestant may experience. 114 M.C.C. at 611."

The Division also failed to consider the admitted fact that many witnesses failed to voice any complaint or criticism, and many acknowledged the availability of satisfactory service. (See Summary, pp. 166–8, 171–2, plaintiffs' initial brief.)

The Division found that the principal indications of dissatisfaction related to existing joint-line service. 114 M.C.C. at 601–2. No acknowledgment was made, however, of the fact that much of such criticism was directed specifically to joint-line service presently provided by Red Ball, Bowman and Johnson. (See Summary, pp. 169–71, plaintiffs' initial brief.)

The Examiners made extensive findings concerning practices followed by shippers that cause or contribute to slow service, such practices being beyond the control of the carriers. (See Summary, pp. 172–3, plaintiffs' initial brief.) These facts were ignored by the Division.

## OTHER MATTERS

Plaintiffs contend that they were denied due process as a result of the intervention of the Johnson shippers. As noted, this intervention was granted before protestants had an opportunity to object. After intervening, the Johnson shippers injected new issues, not presented to the Examiners. The shippers' contentions were more political than judicial. They urged liberalization of the traditional regulatory requisites for certifications, stating that a change in Commission policy was favored by the Administration.

The grant to Bowman, exceeding the scope of its application, was described in a Federal Register notice affording interested parties an opportunity to petition for reopening or reconsideration of that application. Several carriers, including ABF, filed timely petitions in response to the notice, based upon their interests in the Bowman grant, seeking reopening or reconsideration of the Division decision. These petitions pointed out that, while the application was pending, Bowman acquired extensive new authority, and the approved grant failed to contain any restriction preventing Bowman from performing service between points in this newly-acquired territory and points within its new grant. Since the original notice of the Bowman application specifically described its proposal to join its *then existing* authority with that sought, petitioners sought an opportunity to demonstrate the need for a modification or denial of the Bowman grant. These petitions were considered along with numerous petitions seeking reconsideration of the Division order. A total of 32 separate groups of petitions and replies thereto, some exceedingly comprehensive, were denied by a two-to-one vote of the same Division twelve working days after the last pleading was filed. (See Exhibit 5 to Complaint.)

Unless restricted voluntarily or by order of the ICC, a carrier normally can tack newly granted authority with that which it already holds, or with that subsequently acquired. Bowman limited its intention to tack the authority sought in the present proceeding to its then existing authority by the use of the following language as published in the Federal Register of Thursday, August 19, 1965, by stating " * * * with that authority previously granted * * * wherein applicant is authorized to serve points in * * * " and named sixteen (16) states and the District of Columbia. The States of Illinois, Indiana and Ohio were not named in the Federal Register publication. The published language constitutes a specific limitation regarding tacking which did not give notice to the public of any intention to

tack the authority sought in the present proceedings to authority subsequently acquired. Subsequent to the publishing of the "Notice," Bowman acquired Alabama Highway Express which allowed Bowman to serve points in Indiana, Illinois and Ohio. The grant of the authority in the present proceeding by the Commission, Division I, did not contain the limitation against tacking of the authority acquired in the present proceeding. Certain carriers had protested the Bowman application, but withdrew their protest based upon restrictive amendments proposed by Bowman and accepted by the Commission and based upon the limitations of the ability to tack as published in the Federal Register. These carriers, including ABF, sought a reopening, a reconsideration or a denial of the Bowman application, upon the republication required by the Commission because of the change in circumstances in which the Commission was granting more authority to Bowman than had originally been sought and for which notice had been given by the Federal Register publication. The ICC refused to reopen, reconsider or deny the Bowman application without hearing additional evidence based upon the allegations of the petitions filed subsequent to the proposed grant of authority to Bowman.

## CONCLUSIONS OF LAW

1. This court has jurisdiction and venue to review this action of the Interstate Commerce Commission. 49 U.S.C. §§ 17(9), 305(g)–(h), 28 U.S.C. §§ 1336(a), 1398, 2284, 2321–2325.

2. The limited scope of judicial review of the decisions of independent agencies is a well settled principle of administrative law. Generally, an order of such an agency will be sustained if it is within the agency's statutory powers and is based on appropriate findings which in turn are supported by substantial evidence. If these criteria are met, the reviewing court will sustain the agency even though it might disagree with the agency's conclusions or consider them contrary to the weight of the evi-

dence. Consolo v. Federal Maritime Commission, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131; Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 90 L.Ed. 821. In Consolo v. Federal Maritime Commission, at 383 U.S., at 620, 86 S.Ct., at 1026, the Supreme Court emphasized that "[substantial evidence] is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." This court has clearly stated this principle on a number of occasions. Willis Shaw Frozen Express, Inc. v. United States (1966) 256 F.Supp. 257, 264; Reddish v. United States (1960) 188 F.Supp. 160, affirmed sub nom. Interstate Commerce Commission v. J–T Transport Co., Inc., 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147. As this court stated in Patterson v. United States (1959) 178 F.Supp. 771, 774:

> "The Commission is the fact-finder, and the judicial function is exhausted when there is found to be a rational basis for the conclusions reached by the administrative body. Southern Kansas Greyhound Lines v. United States, D.C.W.D.Mo.1955, 134 F.Supp. 502."

3. In determining whether there is a rational basis for the conclusions reached by the administrative body, or whether its decision is based on appropriate findings supported by substantial evidence, the reviewing court must follow the provisions of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). As stated in Columbia Shippers and Receivers Ass'n, Inc. v. United States (Del.1969) 301 F.Supp. 310, 319, *"in addition* to the 'substantial evidence' test generally applicable to this action," the statute requires that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, ca-

pricious, an abuse of discretion, or otherwise not in accordance with law." (Emphasis added.) As recently stated in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413, 91 S.Ct. 814, 28 L.Ed.2d 136, section 706 of the Administrative Procedure Act sets forth "six separate standards." Accord Eastern Central Motor Carriers Ass'n v. United States (D.C.1965) 239 F.Supp. 591, 594; Mitchell Bros. Truck Lines v. United States (Or.1963) 225 F.Supp. 755, 758, aff'd 378 U.S. 125, 84 S.Ct. 1657, 12 L. Ed.2d 744. See also, Campbell Sixty-Six Express, Inc. v. United States, (Mo. 1966) 258 F.Supp. 529; Nashua Motor Express, Inc. v. United States, (N.H. 1964) 230 F.Supp. 646; Omaha Grain Exchange v. United States, (Neb.1961) 194 F.Supp. 929, 934; Stott v. United States, (N.Y.1958) 166 F.Supp. 851, 855; Youngblood Truck Lines, Inc. v. United States, (N.C.1963) 221 F.Supp. 809, 812, and Heavy-Specialized Carriers Conference v. United States, (Mo.1964) 231 F.Supp. 968, 970.

4. In *Overton Park, supra,* the court pointed out that in determining whether an agency decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." 401 U.S., at 416, 91 S.Ct., at 823. The court cited L. Jaffe, Judicial Control of Administrative Action (1965). Professor Jaffe, with reference to "abuse of discretion," states, on page 586 of his text:

" * * * Broadly stated an abuse of discretion is an exercise of discretion in which a relevant consideration has been given an exaggerated, an 'unreasonable' weight at the expense of others. The 'letter' has been observed; the 'spirit' has been violated. Discretion implies a 'balancing'; where the result is eccentric, either there has not been a balancing, or a hidden and mayhap improper motive has been at work."

In Burlington Truck Lines, Inc. v. United States, (1962) 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207, the court at page 245 of 83 S.Ct. said:

"Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.' New York v. United States, 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 662 (dissenting opinion). 'Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body.' Federal Communications Comm'n v. RCA Communications, Inc., 346 U.S. 86, 90, 73 S.Ct. 998, 1002, 97 L.Ed. 1470. The Commission must exercise its discretion under § 207(a) within the bounds expressed by the standard of 'public convenience and necessity.' Compare id., at 91, 73 S. Ct. at 1002, 97 L.Ed. 1470. And for the courts to determine whether the agency has done so, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L. Ed. 1271. The agency must make findings that support its decision, and those findings must be supported by substantial evidence. Interstate Commerce Comm'n v. J–T Transport Co., 368 U.S. 81, 93, 82 S.Ct. 204, 211, 7 L.Ed.2d 147; United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 488–489, 62 S.Ct. 722, 729, 86 L. Ed. 971; United States v. Chicago, M., St.P. & P. R. Co., 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023."

5. Section 706(2)(A) requires the reviewing court to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or *otherwise* not in accordance with law." (Emphasis added.) This terminology and the above authorities clearly recognize

that the determination of these issues involves a question of law. Since these requirements are in addition to the requirement that agency action be supported by substantial evidence, a mere review of the sufficiency of the evidence will not suffice in a proceeding, such as the one now before the court, where the agency action is alleged to be arbitrary and capricious and resulting from an abuse of discretion.

6. In making its decision "the court shall review the whole record or those parts of it cited by a party * * *." 5 U.S.C. § 706. Although some question concerning the court's duty to review the whole record existed prior to enactment of the Administrative Procedure Act, Professors Jaffe and Davis, the two leading authors on administrative law, both emphasize that this question was laid to rest with the decision in Universal Camera Corp. v. N. L. R. B., *supra*. Professor Davis cites the statement by Justice Frankfurter in Universal Camera Corp., at 340 U.S., at 488, 71 S.Ct., at 464, that: "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." K. Davis, Administrative Law Treatise, Vol. 4, § 29.03, at 129–30 (1958). Professor Jaffe explains the requirement for review on the whole record, as follows:

> " * * * This must mean evidence in the case and in the context of the case. To abstract out of a case that part of the evidence which can be made to support a conclusion is to imagine an abstract case, a case that was never tried. *A conclusion based on such abstracted evidence may be 'rational,' but it is not a rational decision of the case which was in fact tried.* Evidence which may be logically substantial in isolation may lose its logical relevance, even its claim to credibility, in context with other evidence. The rationality or substantiality of a conclusion can only be evaluated in the light of so much of the situation as is made to appear * * *."

Judicial Control of Administrative Act, at 601.

7. The record in this proceeding is exceedingly large; however, all portions are not relevant to the Red Ball, Bowman and Johnson applications, and this court's review has been aided by the comprehensive abstracts filed on behalf of the parties. The court has also given careful consideration to the comprehensive findings of fact embodied in the appendices to the Examiners' report and to the Division's report. No challenge was made by any party to the accuracy of these findings of fact and, collectively, they present a comprehensive summary of the evidence.

8. The Commission, acting through one of its Divisions, was not bound by the findings of fact made by the Hearing Examiners. 5 U.S.C. § 557(b). In this case, however, the Division did not reject any of the Examiners' findings and the Commission's counsel asserts that the Division's report "does not reflect any disagreement with the examiners over what the witnesses said or what the exhibits stated." In our review, therefore, we have given consideration to the findings embodied in the Division's report as well as to the findings embodied in the Examiner's report. This procedure was fully discussed in Universal Camera Corp., *supra*, where the court at page 496 of 340 U.S., at page 469 of 71 S.Ct. said:

> "We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along

with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed the other facts which in sum determine whether evidence is 'substantial.' "

See, also, Bituminous Material & Supply Co. v. N. L. R. B., (8 Cir. 1960) 281 F.2d 365.

■ 9. Defendants' briefs contain extensive references to excerpts from the record cited to support the ultimate conclusions of the Division. Defendants urge this court to confine its review to a determination of the substantiality of such portions of the evidence. The court rejects this suggestion. Our duty is to review "the record in its entirety * * * including the body of evidence opposed to the Board's view." Universal Camera Corp., 340 U.S., at 488, 71 S.Ct., at 465.

■ 10. Our review of the Division's report in the light of the whole record compels us to the conclusion that the Division based its ultimate conclusions upon subordinate findings that can be supported only by a consideration of portions rather than the entire record. Such action was, therefore, in the legal sense, "arbitrary and capricious." Campbell Sixty-Six Express, Inc. v. United States, (W.D.Mo.1966) 258 F.Supp. 529.

■ 11. In addition, the Division's report fails to meet the requisites of clarity. 5 U.S.C. § 557(c). In the words of Justice Cardozo: "In the end we are left to spell out, to argue, to choose between conflicting inferences." United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 510–511, 55 S.Ct. 462, 467, 79 L.Ed. 1023. A court cannot "be expected to chisel that which must be precise from what the agency has left vague and indecisive." S. E. C. v. Chenery Corp., 332 U.S. 194, 197, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995. The ambiguity of the report is best illustrated by the Division's treatment of the principal findings of the Examiners. They were neither adopted nor rejected, approved nor disapproved. Counsel for the government says the Division meant one thing, but counsel for Johnson disagrees. But even if counsel agreed, "[e]xplanations proffered in briefs at the appellate level are not an adequate substitute for a reasoned explanation of the result reached in the decision itself." N. L. R. B. v. International Union of Operating Eng., Local 925, (5 Cir. 1972) 460 F.2d 589, 604. As stated in Northeast Airlines, Inc. v. Civil Aeronautics Board, (1 Cir. 1964) 331 F.2d 579, 586: "Courts ought not to have to speculate as to the basis for an administrative agency's conclusion."

■ 12. There is no rational basis for the Division's refusal to give weight to the extensive transit-time studies presented by protestants. These studies constituted the most important part of protestants' evidence and collectively reflected their service on more than 120,000 shipments. No contention was made at the hearing or on brief that they did not portray normal or representative service of the involved carriers. The length of time covered by the studies or the dates embraced therein were not considered significant by the parties or the Examiners. Indeed, these facts were not deemed sufficiently important by the Division itself to be mentioned in its own findings relative to evidence presented by certain protestants. For example, as to plaintiff Campbell, the Division's finding makes no mention of the length of time or the dates involved in its studies. 114 M.C.C. at 777. Other findings were stated in the same manner; that is, the results were set forth without regard to the length or the date of the studies, thereby showing that the Division deemed such facts unimportant. The conclusion that these studies are entitled to little weight because they "relate to short periods of time" is completely arbitrary. Many covered longer periods of time

than those presented by applicants and others covered periods identical to the applicants'. The Division's reliance upon the applicants' studies and its refusal to rely upon protestants' studies constitutes arbitrary and capricious action.

■ 13. The Division's condemnation of protestants' studies on the ground that some "cover traffic handled for specified shippers" is particularly unwarranted. The applicants placed in issue the quality of service rendered by specific carriers to specific shippers by presenting such shippers as witnesses. Protestants then presented shipping documents taken from their files evidencing specific service rendered for those same shippers. Clearly, there is no rational basis for the Division's consideration of such evidence presented by applicants and its refusal to consider such evidence presented by protestants.

14. The rejection of protestants' traffic studies on the ground that they cover periods of time subsequent to the filing of the applications is also without rational basis. The Division made specific findings in favor of applicants based upon applicants' studies that covered similar or later periods of time. Again, one standard was applied to applicants and a different standard to protestants. The "law does not permit an agency to grant to one person the right to do that which it denies to another similarly situated. There may not be a rule for Monday, another for Tuesday, a rule for general application, but denied outright in a specific case." Mary Carter Paint Co. v. F. T. C., (5 Cir. 1964) 333 F.2d 654, 660 (concurring opinion), rev'd on other grounds 382 U.S. 46, 86 S.Ct. 219, 15 L.Ed.2d 128. HC&D Moving & Storage Company v. United States, (Hawaii 1969) 298 F.Supp. 746.

■ 15. The "deficencies" that, in the view of the Division, destroyed the effectiveness of protestants' studies were "deficiencies" that had not been suggested by anyone prior to the Division's ruling. Protestants, therefore,

were given no opportunity to defend the propriety of such evidence or correct such "deficiencies." Applicants and protestants alike had followed identical, established standards in presenting their traffic studies, and if such standards are to be changed, the parties were entitled to reasonable notice and an opportunity to conform to such change. The Commission's failure to do this under similar circumstances required the court, on two occasions, to set aside their orders in Ringsby Truck Lines, Inc. v. United States, (D.C.Colo.1967) 263 F.Supp. 552, appeal dismissed as moot, 389 U.S. 576, 88 S.Ct. 689, 19 L. Ed.2d 775 (1968); Ringsby Truck Lines, Inc. v. United States, (D.C.Colo. 1972) 1972 Fed.Carr.Cas. ¶ 82,305, case dismissed, U.S.Sup.Ct. Oct. 24, 1972. In its first decision the court stated:

"Certainly when carriers appear before the Commission, they are entitled to know by what standards they are going to be judged * * * and indeed the Commission itself has said that 'in fairness, standards should not be changed without due notice.' General Increases—Transcontinental, 319 I.C.C. 792, 803 (1963). See also, E. Brooke Matlack, Inc., v. United States, 119 F.Supp. 617 (E.D.Pa.1954)."

In *Ringsby*, as in the case at bar, the Division rejected traffic studies as not being representative although "there was absolutely no counteravailing evidence" as to their representativeness. This court agrees with the court in *Ringsby* that there was no rational basis for such action.

■ 16. While predicating findings favorable to applicants, upon applicants' traffic studies, the Division refused to consider those portions of the *same exhibits* reflecting unfavorably upon applicants. For example, Bowman's studies are cited to support the conclusion that Bowman *can* perform the type and quality of service proposed (p. 586) but the *identical exhibits* were found to have *no probative value* when cited by protestants to support their challenge that Bowman *cannot* perform

as proposed (p. 611). Since such studies were presented by applicants for the stated purpose of establishing "the feasibility of the proposals," and since applicants still commend them on brief as being the best evidence of applicants' capabilities, the Division's refusal to consider those portions unfavorable to applicants clearly lacks a rational basis.

17. Other evidence received similar arbitrary treatment by the Division. It predicated essential findings upon portions of traffic studies, presented by applicants' shippers, favorable to applicants, but refused to consider comprehensive summaries of the identical studies compiled by protestants and relied upon by protestants to demonstrate that applicants' own exhibits, viewed in their entirety, showed performance by protestants superior to that of applicants as well as reasonably adequate protestant service. The Division also refused to consider interline and service restrictions imposed by Red Ball, Bowman and Johnson, as shown in the record, while predicating conclusions based upon identical restrictions and practices on the part of certain protestants. [Also ignored were additional service restrictions filed with the Commission by such applicants subsequent to the hearing.] Again, the identical type of evidence was relied upon by the Division when favorable to applicants and ignored when adverse to applicants. The Examiners, however, cited and relied upon all such evidence.

18. Other evidence presented by applicants' shippers received similar treatment by the Division. Findings of the Examiners, and findings embodied in an appendix to the Division's report, reflecting unfavorably upon applicants received emphasis by the Examiners but no consideration by the Division.

19. As stated in Baltimore & O. R. R. v. United States, 264 U.S. 258, 265, 44 S.Ct. 317, 319, 68 L.Ed. 667, 674:

"The provision for a hearing implies both the privilege of introducing evidence and the duty of deciding in accordance with it. To refuse to consider evidence introduced or to make an essential finding without supporting evidence is arbitrary action."

20. On its own motion, the Division took official notice of an industry publication which revealed that one terminal described in a protestant's evidence had been closed subsequent to the hearing. At the same time, the Division placed emphasis upon the large number of terminals maintained by applicant Red Ball. Since the same industry publication cited by the Division also revealed that many of Red Ball's terminals had been closed subsequent to the hearing, the Division should have noted that its findings as to Red Ball were substantially incorrect. Most certainly the Division should not have relied upon information in the publication favorable to an applicant while refusing to consider those portions of the same publication reflecting unfavorably upon an applicant. In like manner, if the Division considered it significant that a protestant failed to maintain a terminal at one of the involved points, why was no mention made of Bowman's failure to maintain terminals at numerous, larger cities? The basic rudiments of fairness were simply not applied.

21. The court cannot discern any rational basis for the Division's conclusion that three additional carriers are needed to meet the needs of the shipping public. The report contains no comparative analysis of the quantity of service available between any of the involved points; therefore, there is simply no way to determine whether the available service between any such points is or is not sufficient. Although references were made in an appendix to the grant of certain additional authority to some protestants subsequent to the hearing, neither the extent nor the effect of such authority is mentioned in the Division's evaluation of the evidence. Instead, the Division refers to an exhibit, then more than five and one-half years old, as showing "that comparatively there is a paucity of single-line motor carrier service available." The statement that new

grants of authority to protestants and others have "been accorded full and careful consideration" (p. 576) cannot be accepted as a substitute for adequate findings, and the report is devoid of any findings or any discussion of the total services available at the time of the hearing and at the time of the decision.

The issue before the Commission involved the "present or future public convenience and necessity." 49 U.S.C. § 307(a). At the close of 1971, when its decision was made, the Division discussed only the quantity of service available in early 1966. At the same time, however, it acknowledged its duty to consider the recent grants of authority by citing West Brothers, Inc., Extension—Baton Rouge, La., (1969) 108 M.C.C. 485, 489, and Ayers, Extension—Cheyenne, Wyo., (1965) 99 M.C.C. 795, 797. *West* is uniquely applicable. There, the Commission declined to grant authority to West (a plaintiff herein) between Birmingham and Baton Rouge (points here involved) solely on the ground that one carrier, Mercury (another plaintiff herein), had been granted authority to operate between such points subsequent to the hearing of West's application, stating:

"In order to carry out the dictates of the national transportation policy, we may take official notice of our actions in other proceedings which bear materially upon the issues under immediate consideration. In so doing we must give effect to the actions taken in other proceedings. [citing cases]. While Mercury is not a party to this proceeding, we may take official notice of its recently granted certificate." 108 M.C.C. at 489.

To illustrate: Nowhere in the report now under review does the Commission consider, or even disclose, that the exhibit showing a "paucity of single-line service" reflected only one direct carrier between Atlanta and Baton Rouge in 1966, whereas seven such carriers were in operation at the time of the Division's decision. *West* was decided while the present case was pending on excep-

tions. If the addition of one carrier (Mercury) between Birmingham and Baton Rouge was sufficient to cause denial of West's application, why, indeed, did not the addition of six new carriers require denial of the present applications between Atlanta and Baton Rouge? The Commission's report does not supply a rational answer to this question. Instead, it contains a grant of three more carriers between Atlanta and Baton Rouge, bringing the present total to ten. It also grants two more (Red Ball and Bowman) between Birmingham and Baton Rouge, a decision which appears to be in direct conflict with its prior decision in West.

22. "While the courts cannot be concerned with the consistency or inconsistency of the conclusions and findings of the Commission, 'consistency of administrative *rulings* is essential, for to adopt different standards for similar situations is to act arbitrarily.'" HC&D Moving & Storage Company v. United States, 298 F.Supp., at 751, quoting from Dixie Highway Express, Inc. v. United States, (S.D.Miss.1967) 268 F. Supp. 239, 241.

23. The Division found that "protestants have not shown that they would be seriously adversely affected by such grants." This conclusion is directly contrary to the Division's findings of fact set forth in an appendix to its report. These findings include specific facts showing that the grant of one or more of the applications would result in the serious deterioration of existing service rendered by numerous carriers. The Division found that service to small communities would be curtailed. It also found that carriers would be confronted with an increase in empty vehicle operations, a situation obviously detrimental to efficient and economical service. These are not averments or contentions advanced by protestants; they are specific facts found by the Examiners and by the Division. The Division's conclusion is contrary to such findings.

24. The present situation is similar to that before the court in Campbell Six-

ty-Six Express, Inc. v. United States, *supra*. In that case, as in the case at bar, neither the Commission nor the parties raised any question as to the accuracy of findings of fact set forth in the Examiner's report. On exceptions, however, the same Division of the Commission reached a conclusion contrary to that of the Examiner. The court there recognized the limited scope of judicial review but, at the same time, acknowledged the admonition of Eastern Central Motor Carriers Ass'n v. United States, (D.C. 1965) 239 F.Supp. 591, 594, that "the Court must review the record without a rubber stamp approach." The court relied upon *Eastern* and Nashua Motor Express, Inc. v. United States, (N.H. 1964) 230 F.Supp. 646. Recognizing that the terms "arbitrary" and "capricious" mean "without rational basis," the court concluded that the findings of fact of the Examiner "incontrovertibly demonstrate to this Court" that the conclusions reached by the Division were not justified. In declaring void the Commission's order, the court stated that "we have a situation where facts as found by the Examiner and adopted by the Commission simply do not supply any rational basis" for the Commission's conclusion. Since the Commission's "ultimate conclusion" was not based upon "adequate subordinate findings," the court found that such conclusion was "in the legal sense, 'arbitrary and capricious.'" These findings are fully applicable to the case at bar.

25. Certain defendants seek to support the Division's rejection of protestants' service exhibits as being consistent with prior Commission decisions. They cite Braswell Motor Freight Lines, Inc., Extension—Atlanta, (1966) 100 M. C.C. 482, but in that case the Commission found that:

"* * * most of the service deficiencies relating to transit times about which the supporting shippers and receivers complain and which are reflected in their service exhibits *are not directly disputed or explained in the service exhibits sponsored by any protestant, or otherwise.*" 100 M.C.C. at 493.

Thus, in *Braswell*, the Commission criticized protestants for *failing* to present service exhibits that directly disputed the shippers' exhibits. In the case at bar, however, the Division criticized the protestants because they *did* present such evidence.

Taking note of the Division's rejection of protestants' studies because they related to service rendered after the applications were filed, defendants cite T.S.C. Motor Freight Lines, Inc. v. United States, (Tex.1960) 186 F.Supp. 777, aff'd sub nom. Herrin Transportation Co. v. United States, 366 U.S. 419, 81 S. Ct. 1356, 6 L.Ed.2d 387. Protestants' traffic studies were discredited by the Commission in that proceeding because there was "evidence showing a noticeable increase in satisfactory service shortly prior to the hearings on these applications." There was no such evidence in the present case, however. In fact, applicants here alleged that there was a deterioration of service during the period subsequent to the filing of the applications.

26. The Commission acted within its discretionary powers in permitting the Johnson shippers to intervene and file exceptions. However, the Division should not have permitted such parties to inject new issues, particularly since the Examiners were given no opportunity to rule upon such issues.

27. The Division's rejection of the petition of ABF and others, seeking reopening and reconsideration of the Bowman application, does not appear compatible with the Federal Register notices describing such application. The summary rejection of these and other petitions, by a two-to-one vote of the same Division that reversed the Examiners, indicates a rigid predisposition to uphold the prior decision. The additional publication of the Bowman grant was thereby treated as a meaningless formality.

28. Viewed in its entirety, the Division's report indicates a predilection to grant these particular applications, followed by a strained attempt to marshal findings to support such conclusion. In applying different standards to evidence presented by applicants as contrasted with evidence presented by protestants, and in some instances to the same evidence, the report sounds more in advocacy than in impartial adjudication. Although the court acknowledges the Commission's right to assign proceedings for disposition before its three-member Divisions, it is difficult to understand why this, the largest case of its kind in Commission history, was ultimately disposed of by a two-to-one vote of the same Division that rendered the initial decision. It is noted that the dissenting vote was recorded by a Commissioner who was not a member of the Division at the time of the initial decision. When the petitions were filed, however, he reviewed the record and "became convinced that the consolidated proceeding should be reopened for the purpose of denying *all* the applications." 117 M.C. C. 586, 597.

 29. There must be an end to litigation. These applications have been pending since 1965, and the facts developed in this record have little bearing on a determination at this time of "the present or future public convenience and necessity." For this reason, and because the findings and conclusions of the Division are arbitrary, capricious and without rational basis, no useful purpose would be served by remanding this matter to the Commission.

Judgment is being entered today permanently suspending, annulling and setting aside the orders of the Interstate Commerce Commission issued in Docket No. 1124 (Sub-No. 206) styled Herrin Transportation Company, Extension—Atlanta, Ga., to the extent that said orders authorize the issuance of Certificates of Public Convenience and Necessity to Red Ball Motor Freight, Inc., in Docket No. MC–2229 (Sub-No. 132); to Bowman Transportation, Inc., in Docket No. MC–94201 (Sub-No. 56); and to Johnson Motor Lines, Inc., in Docket No. MC–106401 (Sub-No. 18); declaring said orders to be void; and permanently restraining and enjoining the Commission from issuing said Certificates of Public Convenience and Necessity.

## APPENDIX A

*Statues of Jones Truck Lines, Inc.*

Jones Truck Lines, Inc. (Jones), MC–111231 (Sub-No. 67) filed on June 14, 1965, its application for extension of its present authority (1) between Atlanta, Ga., and Texarkana, Ark., (and intermediate points between Birmingham and Greenville, Miss., and on U.S. 82 in Arkansas); (2) between Texarkana, Ark., and Sherman, Texas, (and all intermediate points); (3) between Birmingham, Ala., and Memphis, Tenn., (no intermediate points); and (4) between Texarkana, Ark., and Dallas, Texas (all intermediate points). Service was restricted against the movement of traffic to or from Memphis, Tenn., and its commercial zone, but not on traffic moving through Memphis and its commercial zone on the one hand, and on the other, points east of the Mississippi River.

Throughout the hearings in the consolidated applications, Herrin Transportation Co., M-1124 (Sub-No. 206), Jones, Bowman and Johnson were commonly referred to as "The Trinity," and filed with the court a joint abstract of the evidence in behalf of "The Trinity," containing seven large volumes. The application was submitted to the Hearing Examiners along with the other nine applications, and all were denied on the ground that the applicants had failed to establish that the present or future public convenience and necessity require the operations proposed in their respective applications.

In reviewing the report and recommendations of the Hearing Examiners, served Nov. 19, 1969, Division 1 at page 601 of Exhibit 1 to the original complaint, stated: "(c) there is not, in our opinion, sufficient traffic to sustain all

of the additional motor carrier operations here proposed, and (d) the granting of all the applications would, as a consequence, materially endanger or impair the operations of existing carriers (and of applicants themselves) contrary to the public interest."

In its findings of fact the Commission at page 612 found that Jones, along with other applicants, had failed to establish the present and future public convenience and necessity, and that the applications should be denied. Accordingly, on December 30, 1971, the Commission granted only the applications of Red Ball, Bowman and Johnson, and denied all others.

Jones petitioned the Commission to reopen the hearing, and on September 6, 1972, the petition was granted and the application reopened for further hearing. In the petition Jones contended that there is a need for some additional services and that the volume of traffic shown to be moving would not sustain the added services and operations proposed by eight applicants; that Jones' application should be granted either in addition to those granted, or in lieu of the grant of authority to Red Ball; that in choosing Red Ball over Jones, the Commission failed to appreciate that the two carriers served different areas; that Jones received more support from connecting carriers than any of the other applicants; that only nine carriers remain as active protestants to the Jones application, and that these are nine of the largest carriers in the United States, and therefore a grant of authority to Jones would not materially affect their operations, and that the grants to Red Ball, Bowman and Johnson without a grant to Jones "strikes a death blow to one of the oldest carriers in the Midwest Central South."

A number of protestants replied to Jones' petition, and charged that the thrust of Jones' petition is that a grant of its application should be based upon the number of witnesses produced rather than upon probative evidence of public need or adequacy of existing service.

Upon the reconsideration, the Commission on December 6, 1972, decided that its order of December 30, 1971, denying the application should be set aside and Jones should be granted authority with certain restrictions.

It is interesting to note that according to Exhibit 1 to the original complaint, Division 1 of the Commission was composed of Commissioners Murphy, Deason and Gresham. Division 1, acting as an Appellate Division, on the date the former report and order were considered, was composed of Commissioners Murphy, Hardin and Gresham. The order of December 6, 1972, reveals that Commissioner Hardin dissented. In his dissent he stated:

"Commencing with my initial review of the record in the consolidated Herrin case, which review occurred prior to the entry of the September 1, 1972, order [the order in which an Appellate Division denied and disposed of certain pleadings as therein set forth] referred to in footnote 5 to the majority report, I became convinced that the consolidated proceeding should be reopened for the purpose of denying all the applications. Therefore, I did not approve the September 1, 1972, order. Further, I did not approve the entry of the October 2, 1972, order, also referred to in footnote 5, wherein a majority of the Commission determined that this massive consolidated proceeding involving 'what is perhaps the most extensive record ever developed in connection with a single group of motor carrier application proceedings before this Commission,' did not involve issues of general transportation importance.

"I remain of the opinion that the applications of Red Ball, Bowman, and Johnson granted in the Herrin case should be denied. Most certainly, the record will not support the grant of any authority to Jones. Accordingly, I dissent."

On June 29, 1973, the plaintiffs filed their motion in this court for leave to serve and file a supplemental complaint

pursuant to Rule 15(d), Fed.R.Civ.P. In the motion plaintiffs referred to the allegations contained in their original complaint filed October 5, 1972, and the prayers for relief contained therein; that subsequent to the filing of the original complaint, the ICC had caused to be issued three additional orders which affect and are material to the issues in this cause. The purpose of the supplemental complaint was to bring before the court for review the subsequent orders and reports issued by the Commission, and for the same relief against the defendants as prayed for in the original complaint, and seeks to set aside, vacate, suspend, enjoin and annul those orders subsequently entered in Docket No. MC–111231 (Sub-No. 67) that would authorize the issuance of an additional Certificate of Public Convenience and Necessity as described therein. A copy of the proposed supplemental complaint was attached to the motion, which contains various allegations and plaintiffs' contentions, and prays that the court issue a temporary restraining order to remain in force and effect until a hearing and determination by the court, and to prevent the report and orders of the Commission from becoming final and effective; to prevent the Commission from issuance of a Certificate of Public Convenience and Necessity to Jones, and that upon a final hearing and determination of the action, that the Commission be permanently enjoined and prohibited from issuing of the Certificates to successful applicants, or in the alternative, that the matter be remanded to the Commission for appropriate action under the applicable facts and law.

On the same day the motion was filed, the court ordered that a full hearing on the motion and other incidental questions that may arise therein or therefrom be held at Fort Smith, Ark., beginning at 10:00 a. m. on Tuesday, July 24, 1973. On July 16, 1973, a motion of intervening defendant Johnson was filed to dissolve the temporary restraining order; to convene a three-judge court to hear and determine plaintiffs applica-

tion for preliminary injunction and motion to file supplemental complaint.

On July 19, 1973, Daisy Manufacturing Company and 69 others filed a motion to intervene as defendants, and if allowed to intervene, to oppose the motion to file supplemental complaint, and if supplemental complaint is allowed to be filed, that they be allowed to file a motion to dismiss the complaint, and to intervene to oppose granting of any temporary restraining order against the issuance of the Jones certificate, and if the court allows the filing of the supplemental complaint and they do not prevail upon their motion to dismiss, that they be allowed to file answer.

On July 23, 1973, Johnson also filed a pleading termed "Opposition to Plaintiffs' Motion to File Supplemental Complaint." On the same date, Red Ball filed its motion to dissolve the temporary restraining order entered November 7, 1972 (350 F.Supp. 545) and to grant plaintiffs' application for preliminary injunction and to dismiss the motion to file supplemental complaint.

Early on the day of the hearing, July 24, Bowman filed its objections to the motion of plaintiffs to file a supplemental complaint.

All of the motions and objections were argued orally by the attorneys for the various parties, and were submitted "upon the complete record heretofore filed in this case, together with all exhibits, briefs and arguments of counsel for the various parties." At the conclusion of the hearing the court entered an order denying the motion without prejudice.

Following the overruling of the motion of plaintiffs to file supplemental complaint, the attorney for Jones was allowed to and did withdraw all motions filed by intervenor Daisy Manufacturing Company.

### ON MOTION TO AMEND JUDGMENT

On September 17, 1973, a motion was filed by the United States and

the ICC seeking an amendment to the judgment so as to provide that the proceedings which are the subject of this suit be remanded to the ICC for further proceedings.

The sole reason assigned in support of the motion is that the form of judgment entered by this court "is a matter beyond the jurisdiction of the court in the circumstances presented."

In its original opinion of September 11, 1973, the court at page 47 in Section 29 of its Conclusions of Law concluded:

"There must be an end to litigation. These applications have been pending since 1965, and the facts developed in this record have little bearing on a determination at this time of 'the present or future public convenience and necessity.' For this reason, and because the findings and conclusions of the Division are arbitrary, capricious and without rational basis, no useful purpose would be served by remanding this matter to the Commission."

Accordingly the court entered a judgment declaring that the orders of the ICC authorizing the issuance of Certificates of Public Convenience and Necessity to Red Ball Motor Freight, Inc., in Docket No. MC–2229 (Sub-No. 132); to Bowman Transportation, Inc., in Docket No. MC–94201 (Sub-No. 56); and to Johnson Motor Lines, Inc., in Docket No. MC–106401 (Sub-No. 18); "be and they are permanently suspended, annulled, and set aside, and are declared to be void; and the Commission is permanently restrained and enjoined from issuing said Certificates of Public Convenience and Necessity."

The suit was filed in this court on October 4, 1972.

The prayer of the complaint is "that upon final hearing and determination of this action, judgment be entered to permanently suspend, enjoin, annul and set aside the orders of the Defendant Commission herein complained of, and that this court enjoin and prohibit the Interstate Commerce Commission from issuing the Certificates of Public Conven-

ience and Necessity to the so-called successful applicants, or, in the alternative, that the matter be remanded to the Defendant Commission for appropriate action under the applicable facts and law."

During the pendency of the action neither of the moving defendants nor any of the intervening defendants challenged or questioned in any way the jurisdiction and authority of this court to enter such an order. All of the defendants in their answers to the complaint took the position that the relief prayed should not be granted, and none of the defendants or intervenors contended that the complaint requested relief beyond the jurisdiction of the court.

The Interstate Commerce Act, 49 U.S.C. § 17(9), provides that when rehearing or reargument or reconsideration of any decision, order, or requirement of a Division shall have been denied by the Commission or an Appellate Division that a suit "to enforce, enjoin, suspend, or set aside such decision, order, or requirement, in whole or in part, may be brought in a court of the United States under those provisions of law applicable in the case of suits to enforce, enjoin, suspend, or set aside orders of the Commission, but not otherwise." This provision of the act was made applicable to motor carrier proceedings by 49 U.S.C. §§ 305(g) and (h).

The Administrative Procedure Act, 5 U.S.C. § 706, provides that the reviewing court shall "compel agency action unlawfully withheld" and "hold unlawful and set aside agency action, findings, and conclusions found to be * * * arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

Title 28, U.S.C. § 1336(a), provides that "the district courts shall have jurisdiction of any civil action to enforce, enjoin, set aside, annul or suspend, in whole or in part, any order of the Interstate Commerce Commission."

Title 28, U.S.C. § 2325, requires that an interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or in part, of

any order of the Interstate Commerce Commission, be granted only by a three-judge court.

Soon after the suit was filed there was a hearing before a single Judge of this court, and a temporary restraining order was issued pursuant to 28 U.S.C. § 2284(3). Arkansas-Best Freight System, Inc., v. United States, (1972) 350 F.Supp. 539. No one contended at that hearing that the Judge was without authority to issue the temporary restraining order, and there is no statute which by its provisions prevents a three-judge court on a hearing on the merits from issuing a permanent injunction.

The movants argue that it is beyond the province of the court to bar the Commission from further consideration of the involved proceedings to determine where lies the public convenience and necessity, and cite and rely upon four cases in support of that argument. None of the cases reveal any extraordinary facts as does the present record. The cases relied upon by movants may be summarized as follows:

Arrow Transportation Co. v. Cincinnati, N. O. & T. P. R. Co., (1965) 379 U.S. 642, 85 S.Ct. 610, 13 L.Ed.2d 550. This case is clearly distinguishable. In *Arrow* the District Court entered an opinion and order, 229 F.Supp. 572 (S.D. Ohio 1967), setting aside the agency order without giving any explanation whatsoever why the proceeding was not being remanded to the agency. In a per curiam opinion the Supreme Court directed that the proceeding be remanded to the Commission, citing only to *Idaho Power Co.*, hereinafter discussed.

United States v. Sasketchewan Minerals, (1966) 385 U.S. 94, 87 S.Ct. 254, 17 L.Ed.2d 192. In this case the District Court did remand the proceeding to the Commission. 253 F.Supp. 504, 509 (W.D.Wis.1965). However, its order of remand set forth unusually strict guidelines circumscribing the scope of the agency's consideration of the proceeding on remand. On appeal the Supreme Court stated that the District Court went too far, stating: "Under the circum-

stances present here, this restriction is an improper limitation on the Commission's duty to reconsider the entire case." 385 U.S. 95, 87 S.Ct. 255, 17 L.Ed.2d 193.

Federal Power Commission v. Idaho Power Co., (1952) 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15. This is the principal case relied upon by movants. A quotation from this case appears on page 2 of movants' memorandum, but it is significant to note that movants fail to point out that the statement quoted was characterized by the Court only as a "guiding principle." The statement is, by no means, an inflexible rule applicable to all proceedings. As hereinafter demonstrated, many cases recognize and apply the reciprocal of this "guiding principle," that is, that a remand will not be ordered unless it appears that it would serve a useful purpose in furtherance of the ends of justice.

Interstate Commerce Commission v. Parker, (1945) 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051. This case has nothing to do with the issue now before the court. It deals only with the broad principles applicable to the Commission's basic determination of the issue of public convenience and necessity.

The court readily recognizes that, in a proper situation, a reviewing court should remand a proceeding to the Commission for further consideration and disposition by the Commission. The situation before this court, however, does not justify such action and, indeed, would not be consistent with orderly procedure nor would it further the ends of justice. The record in this case is voluminous. We are here concerned with the application of three carriers, whereas the record that would be sent back to the Commission on remand deals with the applications of ten carriers.

During the last arguments before the court, a member of the court asked counsel for defendant Johnson if large portions of the record were wholly unrelated to the applications before the court. Counsel acknowledged that this was correct. Indeed, there are tremendous portions of this record that are

wholly unrelated to the applications of Red Ball, Bowman and Johnson. This is a unique situation resulting from the Commission's consolidation of ten major applications, and is a significant fact bearing upon the court's consideration of the Government's motion. The law requires the court to note and consider the uniqueness of the situation.

Since such a large part of the record is unrelated to these applications, a remand of this record would impede rather than facilitate the Commission's consideration of any further proceeding involving the present and future public convenience and necessity. In like manner, if a second court review should later be required, the reviewing court would then be confronted with such a massive record, containing ancient facts, no feasible review of such record could be made.

The court's opinion makes it abundantly clear that the Commission could not, on this record, enter a valid order approving these applications. Accordingly, a new record is required before any valid grant of authority could be made to these carriers.

These applications were filed with the Commission in 1965 and the hearing began in 1966 and ended in 1967. As stated in the court's opinion (p. 47), "the facts developed in this record have little bearing on a determination at this time of 'the present or future public convenience and necessity.'"

This court has concluded that the evidence of record before the Commission did not justify or support the Commission's grant of authority embodied in the orders reviewed by the court. That finding is not challenged by the motion now before the court. The motion suggests only that the proceeding *must* (not *should*) be sent back to the Commission. If this were to be done, the Commission would have before it an extensive record dealing with five and six year old facts. It is apparent, as a matter of law, that such facts could not lawfully support a finding of public need for additional motor carrier service in 1973 or 1974. As pointed out in the court's opinion, there

has been a drastic change in circumstances since the record was closed in 1967. For example, evidence relating to service rendered in 1965 and 1966 by three single-line carriers between Atlanta and Dallas would be of no value whatsoever to a determination of the adequacy or inadequacy of service presently rendered by the 13 single-line carriers now authorized to operate between these cities. These facts are discussed on pages 26–27 and 42–44 of the court's opinion. Since, as pointed out on page 43 of the opinion, the Commission is obligated to consider recent grants of authority, no valid consideration of these applications could be made without giving effect to the extensive changes that have occurred since 1967.

■■ If applicants Red Ball, Bowman and Johnson are still of the opinion that the present or future public convenience and necessity justify and require approval of their applications, the obvious answer is that they should file new applications and present the Commission with current facts reflecting the current situation in order that the Commission might make a legally valid appraisal of the public interest in the light of such facts.

The Government's motion states that this court's judgment of September 11, 1973, "permanently enjoins the issuance of certificates of public convenience and necessity." This, of course, is a misstatement of the court's action. The judgment referred specifically to the orders of the Commission in the proceedings identified by style and docket number and held that such orders "are permanently suspended, annulled and set aside, and are declared to be void; and the Commission is permanently restrained and enjoined from issuing *said* certificates of public convenience and necessity." (Emphasis added.) The only certificates referred to are those that were granted by the specific orders found by this court to be invalid. It is obvious that the Commission stands perfectly free to issue any certificates deemed by the Commission to be appropriate ex-

cept the three certificates described in the Commission's orders that were set aside by the judgment. Red Ball, Bowman and Johnson stand perfectly free to file new applications tomorrow, and the Commission stands free to issue certificates of public convenience and necessity pursuant to such applications without any restraint whatsoever by this court.

The Commission has long recognized the inappropriateness of considering a public-convenience-and-necessity application on the basis of facts that have only historical value. For example, in a proceeding involving an application to extend a rail line (which requires proof of public convenience and necessity, 49 U.S. C. § 1(18), (19)), the Commission stated:

"We cannot see that any useful purpose would be served by a hearing at this time to permit the applicants an opportunity to endeavor to prove that, on the basis of the conditions as they existed in 1927, the issuance of the certificate was proper. Any conclusion we might reach would have to be based on the present and future public convenience and necessity.

" * * * This action does not foreclose the filing of a new application and a hearing thereon at which evidence may be submitted as to whether the present and future public convenience and necessity require the construction which might be proposed." Waco, B., T. & S. Ry. Co. Construction, 254 I.C.C. 327, 337.

Upon a reversal by the court the question whether the proceedings should be remanded to the Commission for further consideration or whether the orders reviewed by the court should be set aside and held for naught depends upon the facts and the statutory scheme involved. In many cases the facts and circumstances as found by the reviewing court and verified by the record disclose that a remand is neither necessary nor proper. The circumstances and facts in the instant case as set forth in the court's opinion conclusively establish that this proceeding should not be remanded to the Commission, and a remand would only create further confusion and result in injustice.

In the consideration of the motion the court has examined several relevant decisions which, in view of the facts and circumstances, require that the motion be denied.

In its opinion this court quoted with approval from the opinion written by District Judge Collinson in Campbell Sixty-Six Express, Inc. v. United States, (W.D.Mo.1966) 258 F.Supp. 529. The decision in that case is particularly pertinent to the issues discussed by this court in its opinion. It is equally pertinent to the issue presented by the Government's motion. In *Campbell* the three-judge court was presented with a suit (filed by one of the plaintiffs herein) challenging the validity of an order entered by the ICC granting a Certificate of Public Convenience and Necessity to Roadway Express (another plaintiff herein). In that case, as in the case at bar, the Hearing Examiner denied the application, but a Division of the Commission, while recognizing the correctness of the Examiner's findings of fact, reached a contrary conclusion and granted Roadway's application. The court concluded that the Commission's action was "arbitrary and capricious" and directed that the order of the Commission be "set aside and declared to be void." There was no remand to the Commission, and there was no appeal. Roadway, the applicant in that proceeding, subsequently filed a new application with the Commission and, on the basis of a new and currently adequate record, obtained a certificate.

Pacific Coast Wholesalers' Ass'n v. United States, (S.D.Cal.1949) 81 F.Supp. 991, was decided by a three-judge court. A suit was filed seeking to set aside an order of the ICC on the ground that there was no rational basis for the Commission's conclusions. The court recognized that "there is evidence of substance to support the Commission's findings of

fact," but found the Commission's conclusions "have no rational basis, and must be set aside." The exact form of the judgment was that "the same are hereby set aside and annulled and the enforcement thereof is hereby permanently enjoined." The case was affirmed on appeal, 338 U.S. 689, 70 S.Ct. 411, 94 L.Ed. 474 (1950). In the per curiam opinion no mention was made of the form of the judgment entered by the District Court.

A similar result was reached in Shannon v. United States, 219 F.Supp. 781 (W.D.Tex.1963), which was also affirmed on appeal, 377 U.S. 311, 84 S.Ct. 1260, 12 L.Ed.2d 341 (1964). In that case the three-judge court set aside an order of the ICC, using the following terminology:

"There is not substantial evidence in the record upon which to base the Interstate Commerce Commission's findings and conclusions * * * defendants should be permanently enjoined from enforcing the terms of said order * * *."

In Garrett Freightlines, Inc. v. United States, (D.Idaho 1971) 324 F.Supp. 575, the three-judge court upheld the Commission's order, in part, and set it aside, in part, stating:

"It is hereby ordered, adjudged and decreed that the order of the Defendant Interstate Commerce Commission * * * granting certain changes in the Certificate of Convenience and Necessity of the applicant therein, be, and the same hereby is, vacated, annulled and set aside."

A similar result was reached in Ashworth Transfer, Inc., v. United States, (D.Utah 1970) 315 F.Supp. 199). And see Pennsylvania R. R. v. United States, (E.D.Pa.1962) 202 F.Supp. 584, where the court permanently enjoined an order of the Commission which had cancelled a rate increase. No appeal was taken in *Garrett, Ashworth,* or *Pennsylvania R. R.*

Although the facts and circumstances are quite different, the case of Zuber v. Allen, (1969) 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345, ·clearly stands for the proposition that a remand to the administrative agency is not always required. That proceeding involved an order entered by the Secretary of Agriculture, and the District Court entered a permanent injunction. The Court of Appeals affirmed in an opinion that specifically noted that there was "no reason" to remand the proceeding. 402 F.2d at 660. The Supreme Court affirmed and, on the question of remand, noted that: "Counsel for the Department has advanced no new theory for sustaining the order." 396 U.S. at 196, 90 S.Ct. at 330, 24 L.Ed. 2d at 362.

The result reached by the court in the consideration of the motion in the case at bar is fully supported by the reasoning in Office of Communication of the United Church of Christ v. Federal Communications Commission, (1969) 138 U.S.App. D.C. 112, 425 F.2d 543. That proceeding involved an application by a television station for a renewal of its license. Initially, in a prior appeal, the Court of Appeals had remanded the cause to the Commission. In the case cited, however, the court set aside the Commission's grant of authority and held that an entirely new proceeding should be instituted by the Commission, instead of proceeding any further on the record that was reviewed by the court. In an opinion written by now Chief Justice Burger, the court stated:

"The record now before us leaves us with a profound concern over the entire handling of this case following the remand to the Commission. The impatience with the Public Intervenors, the hostility toward their efforts to satisfy a surprisingly strict standard of proof, plain errors in rulings and findings lead us, albeit reluctantly, to the conclusion that *it will serve no useful purpose to ask the Commission to reconsider the Examiner's actions and its own Decision and Order under a correct allocation of the burden of proof. The administrative conduct reflected in this record is beyond*

*repair."* (Emphasis added.) 425 F. 2d at 550.

It is most interesting to observe that the attitude of the Commission in the case above quoted was strikingly similar to the attitude of the Commission in the case at bar. It is also interesting to note that, in directing the Commission to start over with a new record, the court used the identical terminology utilized by this court in its opinion of September 11, 1973, that is, that "no useful purpose" would be served by remanding the proceeding to the Commission for further review and consideration of the errors described in the court's opinion.

The jurisdiction and power of the reviewing court to set aside and permanently enjoin the enforcement of an order of the ICC was clearly recognized by the Supreme Court in American Trucking Associations, Inc. v. United States, (1960) 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed. 2d 1527. Although the court did conclude that the case should be remanded to the Commission, the court clearly stated in its opinion why it deemed a remand appropriate, "under the particular circumstances of this case." 346 U.S. at 17, 80 S.Ct. at 1579, 4 L.Ed.2d at 1538. The court made it quite clear that no remand would have been ordered except for "the particular circumstances of this case."

The relationship of the reviewing court and the administrative agency was also discussed in Interstate Commerce Commission v. Atlantic Coast Line R. Co., (1966) 383 U.S. 576, 86 S.Ct. 1000, 16 L.Ed.2d 109. There the court was concerned with the problem of when a carrier could file a suit for review of a Commission order under section 17(9) of the Interstate Commerce Act. It recognized that in some instances a remand to the Commission is required, but that in other cases, the court can finally dispose of the matter "without any necessity for a remand to the Commission. 383 U.S. at 601, 86 S.Ct. at 1015, 16 L.Ed. 2d at 127.

Various other decisions also recognize that a reviewing court may or may not remand a proceeding to the Commission, after concluding that the agency's order is invalid. This was recognized, for example, in Williams v. Washington Metropolitan Area Transit Com'n, (1969) 134 U.S.App.D.C. 342, 415 F.2d 922, 939–940. In that case the court concluded that remand would be "futile" or "manifestly unwarranted" due to "changed circumstances." In Washington Gas Light Co. v. Baker, (1951) 90 U.S.App. D.C. 98, 195 F.2d 29, 35, the Court of Appeals held that the District Court went too far with its order of remand and directed the lower court to dispose of all of the issues that could be decided on the record before the court rather than referring such issues for decision to the Commission.

The court's judgment simply enjoins issuance of the particular certificates authorized in the orders of the Commission held to be invalid. The motion does not contest the court's ruling that such orders are invalid, and, since such orders are invalid, their enforcement should be enjoined.

The judgment does not usurp the administrative functions of the Commission. It simply recognizes and holds that the present record should no longer be utilized by the Commission in its determination of the basic issue of public convenience and necessity. The Commission remains perfectly free to make a new determination of this issue, based upon a new record developed in the light of current facts and conditions. The Commission may direct that this record be developed separately for each of the applicants, or jointly in regard to all of the applicants, as deemed desirable by the Commission. The court has left all of these matters to the Commission and in no way has the court encroached upon the Commission's prerogative to exercise its administrative functions.

The motion of the United States and the Interstate Commerce Commission filed September 17, 1973, is without merit and an order overruling and denying said motion is being entered today.